713 P.2d 840 (1985)
Ronald J. HIGGS, Petitioner,
v.
The DISTRICT COURT In and For the COUNTY OF DOUGLAS, the Honorable William M. Calvert, James R. Florey, Jr. and Michael Miller, Respondents.
James R. FLOREY, Jr. and Michael Miller, Petitioners,
v.
The DISTRICT COURT In and For the COUNTY OF DOUGLAS, the Honorable William M. Calvert, and Ronald J. Higgs, Respondents.
Nos. 83SA493, 84SA19.
Supreme Court of Colorado, En Banc.
December 2, 1985.
As Modified on Denial of Rehearings January 27, 1986.
*842 Long and Jaudon, P.C., Joseph C. Jaudon, Gary B. Blum, Michael T. McConnell, *843 Robert M. Baldwin, Denver, for Ronald J. Higgs.
William M. Calvert, Colorado Springs, pro se.
Wood, Ris & Hames, P.C., F. Michael Ludwig, Jeffrey Clay Ruebel, Denver, for James R. Florey, Jr. and Michael Miller.
Duane Woodard, Atty. Gen., Charles B. Howe, Chief Deputy Atty. Gen., Richard H. Forman, Sol. Gen., John Daniel Dailey, Asst. Atty. Gen., Denver, Amicus Curiae.
Norman S. Early, Jr., Denver Dist. Atty., O. Otto Moore, Asst. Dist. Atty., Brooke Wunnicke, Chief Appellate Deputy Dist. Atty., Denver, amicus curiae for the Colorado Dist. Attys. Council.
Mary G. Allen, Denver, amicus curiae for the Colorado Crim. Defense Bar.
QUINN, Chief Justice.
These consolidated original proceedings, brought under C.A.R. 21, arise out of a civil rights action initiated by Ronald Higgs pursuant to 42 U.S.C. § 1983 (1982) against James R. Florey, Jr., and Michael Miller, deputy district attorneys in the District Attorney's Office for the Eighteenth Judicial District, following a jury verdict acquitting Higgs of the crimes of first degree burglary, first degree sexual assault, and first degree criminal trespass. Higgs' action was based on the claim that Florey and Miller deprived him of his civil rights in the course of investigating the criminal accusations made against him. After a jury awarded Higgs $770,000 compensatory damages and $351,000 exemplary damages, the respondent court granted a new trial on damages and ruled that Florey and Miller were absolutely immune from any liability stemming from their roles in preparing affidavits in support of the warrants for Higgs' arrest and the search of his home.
In Higgs v. District Court in and for the County of Douglas, 83SA493, we granted Higgs' petition for an order directing the district court to show cause why it should not be required to vacate its order concerning absolute prosecutorial immunity, to set aside its order granting a new trial on the issue of damages, and to reinstate the jury verdict. In Florey v. District Court in and for the County of Douglas, 84SA19, we likewise issued an order, at the request of Florey and Miller, directing the district court to show cause why it should not be required to discharge its order for a new trial on damages and to dismiss Higgs' complaint or, in the alternative, to order a new trial on all issues and to limit the evidence to events that preceded Higgs' arrest. We now make the rule absolute in Higgs v. District Court and discharge the rule in Florey v. District Court.

I.
Ronald Higgs was charged with and tried for two counts of first degree burglary,[1] two counts of first degree sexual assault,[2] and one count of first degree criminal trespass.[3] He was ultimately acquitted by a jury on all five counts. Thereafter, in December 1978, Higgs filed a civil action against several defendants, including Sandra Price who was the complaining witness in the criminal case, Edward Rossmeisl, Richard Rozycki, and Steven Smith, who were deputy sheriffs with the Douglas County Sheriff's Department, and James R. Florey, Jr., Michael Miller, and James Peters, deputy district attorneys in the District Attorney's Office for the Eighteenth Judicial District. Although the complaint alleged several claims for relief, the only claims actually submitted to the jury were a malicious prosecution claim against Sandra Price and civil rights claims under 42 U.S.C. § 1983 (1982) against Sheriff's Officers Rossmeisl, Rozycki, and Smith, and Deputy District Attorneys Florey and Miller. All other claims and parties were dismissed.[4] The essence of Higgs' malicious *844 prosecution claim was that Sandra Price initiated and maintained the criminal action against him without probable cause and that she was motivated by malice. Higgs' § 1983 claims were based on the contention that the deputy sheriffs and deputy district attorneys, under color of state and local law, knowingly deprived Higgs of his constitutional rights guaranteed by the Fourth and Fourteenth Amendments to the United States Constitution by authorizing, directing, and/or conducting an illegal and highly suggestive photo identification procedure in order to obtain a positive identification of Higgs as the perpetrator of the alleged crimes under investigation, and by preparing false and misleading affidavits in connection with an order for nontestimonial identification evidence, an arrest warrant for Higgs, and a search warrant for the search of his home.
A recapitulation of the facts leading up to the jury verdicts in Higgs' § 1983 action will provide the necessary background to the issues raised here. On April 12, 1978, Sandra Price, a resident of the Acres Green subdivision in unincorporated Douglas County, reported to the Douglas County Sheriff's office that a man, whom she later identified as Ronald Higgs, had broken into her house at approximately 11:40 a.m. that day. The intruder left when Price confronted him with a pair of sewing scissors. Sheriff's officers investigating the incident found no evidence of forced entry. The evidence later established that at the time of the alleged break-in Higgs was on his way to a luncheon appointment with his minister at a country club some twenty miles from Price's home.
On April 15, shortly after 8:00 p.m., Price reported to the Douglas County Sheriff's Office that at approximately 7:45 p.m. she had been sexually assaulted by the same man who had entered her house on April 12. She stated that her assailant, who was armed with a knife, accosted her in front of her house, forced her into her bedroom, compelled her to commit an act of oral sex, and then raped her anally.
Douglas County sheriff's officers arrived at the Price home about twenty minutes after receiving Price's call. They found no signs of forced entry into the home and no fingerprints. The officers recovered a pair of women's panties from Price's bedroom floor. Tests conducted by the Colorado Bureau of Investigation showed that this undergarment had a semen deposit which contained sperm. Officer Rossmeisl, who headed the rape investigation for the sheriff's office, took Price to Swedish Medical Center for a rape examination. Hospital personnel found no rectal trauma, no semen, and no other evidence of rape. They took samples of Mrs. Price's head hair and *845 pubic hair for comparison with hairs found at the scene of the rape.
Price described her assailant as a white male, approximately thirty-five to forty years old, 5' 10" tall, about 190 pounds, possibly with brown eyes, medium brown hair with some grey at the top of the head and around the ears, grey sideburns, a hairy chest, a space between his front two teeth, no facial scars, possibly a cigarette smoker, and wearing a silver ring with a large turquoise stone on the little finger of his right hand. The assailant, according to Price, left her home in a pickup truck with a white roof and blue body. Higgs, who was 42 years old in 1978, has overlapping front teeth, distinctive green eyes, no hair whatsoever on his chest, a scar below his lower lip, had only a few grey hairs at the base of his sideburns at the time, did not smoke, and, according to his and other witnesses' testimony, had never worn a ring on his little finger. Higgs did own a pickup truck at the time of the alleged assault on Price. The truck, however, had a blue roof, white hood and upper side panels, and blue lower side panels. According to Higgs and his wife, they were watching a movie at a Tamarac Square movie theatre in southeast Denver at 8:00 p.m. on April 15, 1978.
On April 17 Price reported seeing her assailant driving his pickup on Surrey Ridge Road and stated that his license plates had the prefix "RV." Higgs had purchased his pickup in April 1978 and had only a temporary registration sticker on the truck on April 17. On May 5 Price reported that she was brutally beaten and raped again by the same man who had entered her home on April 12 and sexually assaulted her on April 15. Her report to the sheriff's office described the following events. The man came into the kitchen from the garage, grabbed her by the wrist, struck her on the side of her head and neck, and dragged her through the kitchen by her shoulders. Price struck her head on the doorway between the kitchen and the living room so hard that she thought she would black out. The assailant then pushed her to the living room floor, hit her in the stomach hard enough to knock the wind out of her, and put his knee in her stomach to keep her pinned to the floor. He then raped her twice vaginally, and she was sure that he ejaculated once.
After Price reported this rape, she was taken to Swedish Medical Center for another rape examination. This examination, like the previous one, showed no physical evidence of the alleged rape and beating, no bruises or abrasions around the head, neck or stomach, no vaginal trauma, and no trace of semen. Hospital personnel again took body fluid and head and pubic hair samples. The Douglas County sheriff's investigation of the Price home revealed no fingerprints, no sign of forced entry, and, although it had snowed two to three inches that day, no footprints anywhere around the house.[5]
On May 8 Higgs went to the Douglas County Sheriff's Office to be fingerprinted for a security dealer's license. Officer Rozycki recognized Higgs as a person who had been identified as a potential suspect because he lived in the same subdivision as Price and owned a blue and white pickup with license plate prefix "RV."[6] Although Rozycki took a complete set of fingerprints, he did not report seeing any rings on either of Higgs' little fingers. To obtain color photographs of Higgs for use in suspect identification, Rozycki falsely told *846 Higgs that the sheriff's office took pictures of all persons who had their fingerprints taken.
On May 9 Officer Rossmeisl took Price by Higgs' house to see if she could identify his truck. She said that it was definitely not the truck driven by her assailant. Later that day two sheriff's officers stopped Higgs in his truck, apparently without cause.[7] One of the officers later reported seeing a silver ring on Higgs' little finger at this time.
On May 19 Price identified Higgs as her assailant from a photo lineup. She later testified at a suppression hearing in Higgs' criminal prosecution that at the time of the photo identification she was not completely positive that the man in the picture was her assailant. One source of her uncertainty was the poor quality of the picture which the sheriff's officers had obtained from the Colorado Department of Motor Vehicles. Upon completion of the photo identification Officer Rossmeisl, who had been in constant contact with the district attorney's office since the first reported rape, again contacted attorneys in the district attorney's office but was told that there was not enough evidence to take any action against Higgs.
Rossmeisl then learned of the May 9 stop of Higgs during which another officer saw a silver ring on Higgs' finger. After Rossmeisl informed the district attorney's office of this incident, Deputy District Attorney Florey apparently told Rossmeisl there was sufficient information to seek a Crim.P. 41.1 order for removal of bodily fluids and hair samples from Higgs for comparison with those taken from the scene of the rape.[8] Rossmeisl testified that Florey and Miller prepared the affidavit in support of this warrant, decided what information to include in the affidavit, and how to characterize that information. Although Florey and Miller, according to Rossmeisl's testimony, knew that Price had stated that Higgs' truck was definitely not the one driven by her assailant, the affidavit did not mention that fact, nor did it mention any other exculpatory information.[9] Florey *847 testified that he neither drafted nor reviewed this affidavit. Miller testified that he may have reviewed it for grammatical errors and to check the legal language, but that he did not draft the factual statements.
Based on this affidavit, a judge on May 19, 1978, issued the order for nontestimonial identification evidence, which Officer Rossmeisl executed on the morning of May 22. Higgs was taken to Swedish Medical Center, where samples of his blood, saliva, head hair and pubic hair were obtained. The Colorado Bureau of Investigation conducted laboratory tests that showed that neither Price's nor Higgs' hair matched the hair found at the scene of the alleged rape.[10]
On June 6 Officer Rossmeisl contacted Deputy District Attorney Florey. Rossmeisl either obtained permission or was directed by Florey to show Sandra Price the two color photographs of Higgs that Officer Rozycki had surreptitiously obtained when Higgs came to the sheriff's office to be fingerprinted for a security dealer's license. No other pictures were shown for comparison, and Price made a positive identification at that time. Later that day Rossmeisl met with Deputy District Attorneys Florey and Miller to prepare affidavits in support of warrants for Higgs' arrest and for the search of his home for clothing that Price had described her attacker as wearing and for the knife allegedly used in the first rape. It was Rossmeisl's testimony that Florey and Miller drafted the affidavits and decided what information to include and how to characterize it. As in the case of the affidavit supporting the order for nontestimonial identification evidence under Crim.P. 41.1, these affidavits failed to mention Price's statement that Higgs' truck was not the truck driven by her assailant and also excluded the fact that Higgs' hair samples did not match the hair found at the scene, even though Florey and Miller were aware of these facts. Florey and Miller, however, denied the drafting of the affidavits for the arrest and search warrants issued on June 6, 1978.
Higgs was arrested later that day while at his office, in full view of other people in the building. The search warrant for Higgs' home was executed simultaneously, although only Higgs' three youngest children were home. When Higgs' wife and mother later came home in the middle of the search, they were informed that Higgs had been arrested for sexual assault and burglary.
Higgs' arrest generated extensive publicity. Prior to Higgs' criminal trial, Higgs' attorney informed Deputy District Attorney Florey of Higgs' alibis, the fact that he had a vasectomy and could not produce sperm, and that Higgs' truck had no license plates on April 17.[11] Higgs' criminal trial was also widely publicized in the community. There was evidence in the § 1983 trial that Higgs' character changed dramatically as a result of the prosecution, that his acquittal failed to restore his reputation, that he incurred substantial legal fees in defense of the criminal charges, that he found it necessary to give up his insurance *848 business, and that his wife subsequently divorced him.
Following his acquittal in the criminal prosecution, Higgs filed a civil action alleging, inter alia, violation of his civil rights under 42 U.S.C. § 1983 (1982). Insofar as relevant here, Higgs alleged that Florey and Miller's participation in drafting the affidavits in support of the Crim.P. 41.1 order for nontestimonial identification evidence and the arrest and search warrants deprived him of his Fourth Amendment rights and that Florey's approval of a suggestive photo lineup consisting of only two color pictures of Higgs violated his Fourteenth Amendment right to due process. Florey and Miller moved to dismiss the § 1983 claims against them, arguing that as prosecutors they were absolutely immune for any investigatory activity necessary to the decision to prosecute. The respondent court denied this motion on the grounds that investigative activity is not absolutely immune under 42 U.S.C. § 1983. Florey and Miller also filed an in limine motion to exclude evidence of any events relating to Higgs' prosecution that occurred subsequent to Higgs' arrest, claiming the evidence was prejudicial and irrelevant, since they were absolutely immune for all post-arrest conduct. Higgs argued that this motion should be denied because this evidence was at least relevant to the issue of damages. The respondent court denied the motion, concluding that the evidence was admissible for some purposes and that a limiting instruction to the jury would be the appropriate way to resolve the problem.
The respondent court submitted to the jury Higgs' claim for malicious prosecution against Price, his § 1983 claim against Sheriff's Officers Rossmeisl, Rozycki and Smith, and his § 1983 claim against Deputy District Attorneys Florey and Miller. The court gave extensive instructions to the jury on the elements of Higgs' § 1983 claims and on the constitutional duties of law enforcement officers and prosecuting attorneys with respect to photo identifications, nontestimonial identification evidence, and arrest and search warrants, including the duty not to prepare false or misleading affidavits in connection with applications for court orders directed to a criminal suspect. The jury was also instructed on the affirmative defense of qualified immunity in connection with Higgs' § 1983 claims. The jury returned a special verdict finding Price, Rossmeisl, Rozycki, Florey, and Miller liable to Higgs for compensatory damages in the amount of $770,000 and finding no liability on the part of Smith. The jury assessed the following exemplary damages against the individual defendants:

 Florey $100,000
 Miller $100,000
 Rossmeisl $100,000
 Rozycki $ 1,000
 Price $ 50,000

After the jury's verdicts were returned, Rossmeisl, Rozycki, and Price reached settlements with Higgs. Florey and Miller, however, filed motions for judgment notwithstanding the verdict and for new trial, claiming, inter alia, that (1) they were absolutely immune because their actions were advocatory, not investigatory, in nature; (2) the trial court abused its discretion under CRE 403 in admitting evidence of post-charging events relating to Higgs' prosecutioni.e., evidence that Florey was told of Higgs' alibis for April 12 and 15 and of the absence of license plates on Higgs' pickup truck on April 17, and evidence that Higgs was acquitted in his criminal trial; and (3) the jury verdict was excessive and was motivated by bias, prejudice, or passion, or, if not so motivated, was so manifestly excessive as to require the court to order Higgs to choose between a remittitur and a new trial.
The respondent court ruled that Florey and Miller were absolutely immune for their role in preparing the arrest and search warrants on June 6 but not for preparing the affidavit supporting the nontestimonial identification warrant on May 19 and that Florey was not absolutely immune with respect to approving or directing the photo identification procedure. Although *849 the court rejected Florey's and Miller's challenge to the admission of post-arrest events, it ordered a new trial on damages. The court concluded that the compensatory damage award was "grossly excessive and [could not] be explained by any facts in evidence" and that a new trial on compensatory damages required the setting aside of the exemplary damages award also.
Florey and Miller thereafter filed an original proceeding in this court, as did Higgs. Florey and Miller claim that the respondent court grossly abused its discretion in three particulars that warrant extraordinary relief by this court: (1) in not dismissing Higgs' § 1983 claim on the ground that as a deputy district attorney Florey was absolutely immune in connection with the photo identification procedure in which Sandra Price identified Higgs as her assailant, and that Florey and Miller, again acting as deputy district attorneys, were absolutely immune for their activities relating to the nontestimonial identification order issued under Crim.P. 41.1 and to the arrest of Higgs and the search of his home; (2) in ordering a new trial solely on the issue of damages because, in view of the form of the verdict, it is possible that the jury found against them on the basis of conduct that would be absolutely immune under the judge's post-trial ruling; and (3) in failing to limit evidence in the new trial to events relating to the investigation and prosecution of Higgs that occurred prior to his arrest. Higgs, in contrast, argues that the court grossly abused its discretion (1) in limiting his damage claim in the new trial to Florey's role in the photo identification procedure and to Florey and Miller's conduct in preparing the affidavit in support of the nontestimonial identification order; and (2) in granting a new trial on both compensatory and exemplary damages.

II.
Before we address the merits of the issues raised in these proceedings, it is appropriate to state the reasons why we have elected to exercise our original jurisdiction in this matter. Our jurisdiction in original proceedings is rooted in article VI, section 3 of the Colorado Constitution. Although our exercise of original jurisdiction is discretionary and is not a substitute for an appeal, People v. District Court, 673 P.2d 991 (Colo.1983); Sanchez v. District Court, 624 P.2d 1314 (1981), we have chosen on prior occasions to address issues of significant public importance raised pursuant to C.A.R. 21. See, e.g., People v. District Court, 673 P.2d 991; Sanchez, 624 P.2d 1314; Stull v. District Court, 135 Colo. 86, 308 P.2d 1006 (1957). Because this case raises significant issues relating to the nature and scope of prosecutorial immunity under 42 U.S.C. § 1983 and because these questions have not previously been addressed by this court, we deem it appropriate to consider these issues in this proceeding. Considerations of judicial economy also operate in favor of resolving other issues raised by the parties in order to avoid an unnecessary retrial and possibly a subsequent appeal, especially since these other issues are closely related to the principal matter in controversy. We therefore will first consider the nature and scope of prosecutorial immunity under 42 U.S.C. § 1983 and then the other issues raised by the parties with respect to the respondent court's order for a new trial on damages.

III.
We turn then to the primary question before us, which is the type of functions for which a prosecutor is absolutely immune from liability for a civil rights claim under 42 U.S.C. § 1983. In its post-trial order, the respondent court ruled that Florey and Miller were absolutely immune for drafting the affidavits in support of the warrants for the arrest of Higgs and the search of his home but that they were not absolutely immune for drafting the affidavit supporting the Crim.P. 41.1 order for nontestimonial identification evidence or for approving the photograph identification procedure for Higgs. Pointing to the presence of several factors as indicative of absolutely immune conduct, Florey and Miller argue that absolute immunity should extend *850 to all of the above acts.[12] In contrast, Higgs argues that, since preparing affidavits in support of arrest and search warrants is an investigatory activity traditionally performed by the police, Florey and Miller are not absolutely immune. We conclude that, under the particular facts of this case, Florey and Miller are not entitled to absolute immunity for drafting affidavits in support of the arrest warrant, the search warrant, and the nontestimonial identification order, nor does Florey enjoy absolute immunity for approving the photo identification procedure.

A.
Section 42 U.S.C. § 1983 (1982), states in pertinent part as follows:
Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.
This statute, which admits of no exceptions on its face, must be read against a common-law background of official immunity. Tenney v. Brandhove, 341 U.S. 367, 71 S.Ct. 783, 95 L.Ed. 1019 (1951).
Because of the need to preserve a prosecutor's independent decision-making and to prevent undue deflection of attention from public duties, prosecutors have long enjoyed absolute immunity at common law for performing certain quasi-judicial acts. The rule of absolute immunity with respect to a prosecutor's quasi-judicial acts finds its source in the principle of absolute immunity for judges. Judges "are not liable to civil actions for their judicial acts, even when such acts are in excess of their jurisdiction, and are alleged to have been done maliciously or corruptly," Bradley v. Fischer, 80 U.S. (13 Wall.) 335, 351, 20 L.Ed. 646 (1871), so long as the judge does not act in the clear absence of all jurisdiction.[13] The rationale for absolute judicial immunity was set forth by the Supreme Court in Bradley:
For it is a general principle of the highest importance to the proper administration of justice that a judicial officer, in exercising the authority vested in him, shall be free to act upon his own convictions, without apprehension of personal consequences to himself. Liability to answer to every one who might feel himself aggrieved by the action of the judge, would be inconsistent with the possession of this freedom, and would destroy that independence without which no judiciary can be either respectable or useful.[14]
*851 Id. at 347. Prosecutors, like judges, must exercise discretionary judgment on the basis of evidence developed in the course of a formal criminal proceeding, and the functional similarity of their duties in such instances accounts for the characterization of prosecutorial immunity as "quasi-judicial." Imbler v. Pachtman, 424 U.S. 409, 423 n. 20, 96 S.Ct. 984, 991 n. 20, 47 L.Ed.2d 128 (1976).
The same policies supporting absolute immunity for prosecutors at common law also support granting prosecutors absolute immunity from lawsuits brought under 42 U.S.C. § 1983. The Supreme Court in Imbler, 424 U.S. 409, 96 S.Ct. 984, addressed the § 1983 liability of a state prosecutor for initiating a criminal prosecution and for presenting the state's case at trial. The court held that a prosecutor was absolutely immune for such actions because they were clearly within those prosecutorial duties "intimately associated with the judicial phase of the criminal process." Id. at 430, 96 S.Ct. at 994.[15] Although the Court in Imbler did not offer any clear demarcation between those acts which fall into the absolutely immune category and those that do not, and also declined to consider whether the principle of absolute immunity shielded a prosecutor's administrative and investigative activities from § 1983 liability, it did endorse a functional approach in resolving § 1983 immunity issues. Id.; see also Harlow v. Fitzgerald, 457 U.S. 800, 811, 102 S.Ct. 2727, 2734, 73 L.Ed.2d 396 (1982).
Two years after Imbler, the Supreme Court in Butz v. Economou, 438 U.S. 478, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978), concluded that federal administrative officials who initiate or participate in an administrative proceeding that is ultimately subject to agency adjudication perform functions analogous to a prosecutor and, as such, are entitled to absolute immunity from damages claims for their participation in the administrative proceeding. The Court in Butz relied heavily on Imbler's rationale and also emphasized the existence of "safeguards built into the judicial process [that] tend to reduce the need for private damages actions as a means of controlling unconstitutional conduct." Id. at 512, 98 S.Ct. at 2913. These safeguards include the presence of an impartial judge and jury and the adversarial nature of the process, with its opportunities for objection, cross-examination, rebuttal, and presentation of the other side's case in chief. Id. at 512-16, 98 S.Ct. at 2913-15. The Butz court also noted that absolute immunity must be strictly limited to situations in which the underlying rationale for the doctrine clearly shows that an absolute exception from § 1983 liability is required. Id. at 506, 98 S.Ct. at 2910. This is so because the damages remedy provided by § 1983 is a "vital means of providing redress for persons whose constitutional rights have been violated." 438 U.S. at 504, 98 S.Ct. at 2909. Moreover, "[t]he barrier of sovereign immunity is frequently impenetrable," and "[i]njunctive or declaratory relief is useless *852 to a person who has already been injured." Id.
Absolute immunity must be distinguished from qualified immunity. Absolute immunity is strictly limited to those officials whose "special functions or constitutional status requires complete protection from suit," Harlow v. Fitzgerald, 457 U.S. at 807, 102 S.Ct. at 2732, and is the exception rather than the norm. Qualified immunity, in contrast, represents the norm, especially for executive officials. Id. Qualified immunity provides a governmental official performing a discretionary function with an entitlement to immunity from liability upon a showing that the challenged conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Id. at 818, 102 S.Ct. at 2738; see Mitchell v. Forsyth, ___ U.S. ___, ___, 105 S.Ct. 2806, 2811, 86 L.Ed.2d 411 (1985). The applicability of qualified immunity will turn "primarily on objective factorsthat is, the objective reasonableness of an official's conduct, as measured by reference to clearly established law." Harlow, 457 U.S. at 818, 102 S.Ct. at 2738.[16] Qualified immunity thus effectuates a balance between the competing values of discouraging abuse of citizens' rights through a damages remedy and of preserving the vigorous and independent exercise of official authority. As the Supreme Court observed in Harlow:
By defining the limits of qualified immunity essentially in objective terms, we provide no license to lawless conduct. The public interest in deterrence of unlawful conduct and in compensation of victims remains protected by a test that focuses on the objective legal reasonableness of an official's acts. Where an official could be expected to know that certain conduct would violate statutory or constitutional rights, he should be made to hesitate; and a person who suffers injury caused by such conduct may have a cause of action. But where an official's duties legitimately require action in which clearly established rights are not implicated, the public interest may be better served by action taken "with independence and without fear of consequences." Pierson v. Ray, 386 U.S. 547, 554, [87 S.Ct. 1213, 1217, 18 L.Ed.2d 288] (1967).
457 U.S. at 819, 102 S.Ct. at 2738 (footnotes omitted).

B.
We turn then to the question of the relevant criteria for determining whether a prosecutor's acts are absolutely immune or only qualifiedly immune under 42 U.S.C. § 1983. In the wake of Imbler, several lower federal courts have employed a functional *853 analysis in determining whether particular conduct is absolutely immune. These decisions generally distinguish between a prosecutor's "advocatory" functions, which are closely related to the judicial process and thus are absolutely immune, and his "investigative" or "administrative" functions, which have a more attenuated connection with the judicial process and are, therefore, only qualifiedly immune. E.g. Gray v. Bell, 712 F.2d 490 (D.C.Cir.1983), cert. denied, ___ U.S. ___, 104 S.Ct. 1593, 80 L.Ed.2d 125 (1984); McSurely v. McClellan, 697 F.2d 309 (D.C. Cir.1982); Marrero v. City of Hialeah, 625 F.2d 499 (5th Cir.1980), cert. denied, Rashkind v. Marrero, 450 U.S. 913, 101 S.Ct. 1353, 67 L.Ed.2d 337 (1981); Forsyth v. Kleindienst, 599 F.2d 1203 (3d Cir.1979), on remand, 551 F.Supp. 1247 (E.D.Pa. 1982), aff'd, 729 F.2d 267 (3d Cir.1984), aff'd in part and rev'd in part sub nom. Mitchell v. Forsyth, ___ U.S. ___, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985); Briggs v. Goodwin, 569 F.2d 10 (D.C.Cir.1977), cert. denied, 437 U.S. 904, 98 S.Ct. 3089, 57 L.Ed.2d 1133 (1978); Hampton v. City of Chicago, 484 F.2d 602 (7th Cir.1973), cert. denied, 415 U.S. 917, 94 S.Ct. 1413, 39 L.Ed.2d 471 (1974); Robichaud v. Ronan, 351 F.2d 533 (9th Cir.1965); J.D. Pflaumer, Inc. v. United States Department of Justice, 450 F.Supp. 1125 (E.D.Pa.1978). We agree that the functional approach is the proper one to determine whether the prosecutorial conduct at issue here is absolutely or only qualifiedly immune.
The overriding inquiry in determining whether a particular act is advocatory or investigative focuses on how closely the act is associated with the initiation or conduct of a formal criminal prosecution. Gray, 712 F.2d 490; McSurely, 697 F.2d 309; see Imbler, 424 U.S. at 430, 96 S.Ct. at 994. Although there is no litmus test that will unequivocally resolve this question, a review of pertinent case law yields three distinct factors that are particularly useful in determining whether a particular course of prosecutorial conduct can be properly categorized as advocatory and thus absolutely immune: (1) whether the challenged conduct occurred prior or subsequent to the filing of formal criminal charges against the person seeking redress, see Marrero, 625 F.2d at 508; Briggs, 559 F.2d at 19-20; (2) whether there existed safeguards that could deter or mitigate prosecutorial abuse and thus reduce the need for a civil action to redress the violation of constitutional rights, Butz, 438 U.S. 478, 98 S.Ct. 2894; and (3) whether the challenged conduct more closely resembled traditional police conduct than prosecutorial conduct, Marrero, 625 F.2d at 508; Hampton, 484 F.2d at 609; Robichaud, 351 F.2d at 536. We discuss each of these factors before applying them to the facts of this case.

1. Stage of the Proceedings.

The first inquiry in assessing whether particular prosecutorial conduct is absolutely immune focuses on whether the conduct occurred prior or subsequent to the filing of criminal charges. Because of the formal and practical consequences attaching to the filing of charges, the charging decision provides a rough dividing line between activity that is likely investigative and that which is likely advocatory. The Supreme Court in Imbler, for example, granted prosecutors absolute immunity for initiating the prosecution and for conducting the state's case largely because of the need to preserve the effective functioning of the trial process. See 424 U.S. at 424-26, 430-31, 96 S.Ct. at 992-93. This focus on the harm to the judicial process clearly implies that the importance of the challenged conduct to the effective performance of the prosecutor's advocacy function in the criminal prosecution determines, to a great extent, whether there is sufficient need to cloak the challenged conduct with absolute immunity. As the Fifth Circuit Court of Appeals has observed:
[W]hen a prosecutor acts outside his quasi-judicial role, he is not making decisions comparable to those of a judge or grand juror. Thus, subjecting him to liability for such decisions will not interfere to the same degree with the effective functioning of the criminal judicial system.

*854 Only discretion that is quasi-judicial in nature requires absolute insulation from suit because only such discretion is so crucial to the effectiveness of the truth-finding process to outweigh the countervailing policy that government officials should be subject to suit for violations of civil rights.
Marrero, 625 F.2d at 508 (district attorney who advised police concerning an illegal search, and who participated in the search, was entitled only to qualified immunity). The Court of Appeals for the District of Columbia has expressed a similar view:
By the plain import of the Court's remarks, absolute immunity under Imbler extends only so far as necessary to protect a prosecutor's decision with respect to the initiation and conduct of particular cases. Imbler does not, in our reading, immunize prosecutors for any and all measures they may undertake in the course of wide-ranging law enforcement investigations or general fact-finding expeditions.
Briggs, 569 F.2d at 19-20 (prosecutor's alleged perjury before judge in investigative grand jury proceeding was entitled only to qualified immunity because his testimony was unrelated to "advocacy issues such as whether to initiate a prosecution or how to conduct a prosecution once begun").
The filing of formal criminal charges provides a starting point for identifying conduct that is closely associated with the trial process (advocatory conduct). The charging document, which constitutes a formal criminal accusation against the accused, sets in motion the state's prosecutorial apparatus and thus signals that the nature of the state's role is changing from investigative, police-dominated activity to accusatory, prosecutorial-dominated activity. Although this formal distinction has limitations and should not be viewed as absolute, it does provide a first step in determining whether particular conduct should be cloaked with absolute immunity.
The charging decision also has practical consequences that support its use as a dividing line between advocatory and investigative conduct. Foremost among these is the resentment it engenders in the accused. One of the underlying bases for Imbler's grant of absolute immunity to prosecutors engaged in initiating and conducting the state's case is that such activity is particularly likely to cause extreme resentment on the part of the accused and, in the event of a resolution favoring the accused, to incite retaliatory action against the prosecutor. Imbler, 424 U.S. at 424-25, 96 S.Ct. at 992. We acknowledge that most innocent persons would feel resentment at being subjected to an arrest and to a search of their person, home, or effects, and that these activities do carry some accusatory overtones. But these acts fall short of the formal accusation, inherent in the filing of criminal charges, that the named person committed the charged crime. We are satisfied, however, that the decision to file charges against a particular person, because of its accusatorial overtones, carries a qualitatively greater risk of inciting retaliatory litigation than pre-charging decisions.
We recognize that the Supreme Court in Imbler noted that some prosecutorial "actions preliminary to the initiation of a prosecution and ... apart from the courtroom" might involve advocatory conduct. 424 U.S. at 431 n. 33, 96 S.Ct. at 995 n. 33. In Forsyth, 599 F.2d 1203, the Third Circuit Court of Appeals pursued this observation, holding that as long as the prosecutor's conduct in securing information is "necessary" to deciding whether to initiate a criminal prosecution, it should be cloaked with the same absolute immunity that protects the prosecutor's decision to prosecute. The court, however, cautioned that what constitutes "necessary" investigative activities should be construed narrowly:
The right to make the decision [to initiate prosecution] without being subject to suit must include some limited right to gather necessary information. At the same time, we are sensitive to the possibility that this narrow exception could be distorted to include all of the prosecutor's investigative activities. *855 599 F.2d at 1215 (emphasis added). See also Cook v. Houston Post, 616 F.2d 791 (5th Cir.1980) (prosecutor held absolutely immune for interviewing prospective grand jury witnesses and investigating documents); Wilkinson v. Ellis, 484 F.Supp. 1072 (E.D.Pa.1980) (decision on immunity reserved, pending further discovery to determine whether prosecutor's participation in illegal police interrogation involved gathering information "necessary" to decision to prosecute).
While there may be instances where absolute immunity will apply to a prosecutor's conduct that occurs prior to the filing of criminal charges, we believe a "rule of necessity" proves too much. Practically all investigatory activity by police or prosecutors is arguably necessary in some degree to the decision to initiate a criminal prosecution. To clothe all such "necessary" activity with absolute immunity, in addition to obliterating the advocatory-investigative distinction, would virtually eliminate all meaningful redress for prosecutorial violations of civil rights stemming from pre-filing investigative conduct and, to this extent, would extend immunity far beyond what is needed to further the purposes of the immunity doctrine. Moreover, this virtually unlimited view of prosecutorial immunity leads to the result that a prosecutor may be absolutely immune for the same conduct for which a policeman would be liable. As the Court of Appeals for the Ninth Circuit stated in Robichaud, 351 F.2d at 536:
[W]hen a prosecuting attorney acts in some capacity other than his quasi-judicial capacity, then the reason for his immunityintegral relationship between his acts and the judicial processceases to exist. If he acts in the role of a policeman, then why should he not be liable, as is the policeman, if, in so acting, he has deprived the plaintiff of rights, privileges, or immunities secured by the Federal Constitution and laws?[17]

2. Contemporaneous Safeguards.

The second factor bearing on the question of immunity is whether there existed contemporaneous safeguards that could deter or mitigate prosecutorial abuse and thus "reduce the need for private damage actions as a means of controlling unconstitutional conduct." Butz, 438 U.S. at 512, 98 S.Ct. at 2913. The Supreme Court in Butz made clear that the existence of safeguards built into the trial processsuch as the adversarial nature of the judicial proceeding, the potential for cross-examination and rebuttal, and the existence of an impartial fact finderis one of the main grounds supporting the grant of absolute immunity to prosecutors in conducting the state's case. Id. at 512-16, 98 S.Ct. at 2913-15. These safeguards perform the dual functions of restraining and mitigating prosecutorial abuse. Marrero, 625 F.2d at 509.
However, the main safeguards against prosecutorial abuse outside the judicial setting criminal and professional sanctions may be relatively ineffectual compared to the safeguards present in judicial proceedings:
No surveillance comparable to that of a judge serves to check a prosecutor's zeal when he makes statements about individuals outside the courtroom or when he engages in investigative activities of directing, advising, assisting, or participating with, the police in obtaining evidence. Moreover, when a prosecutor engages in *856 unconstitutional conduct outside the courtroom, absent are the remedies which the judicial process by its nature provides for illegal conduct occurring within the process. When a prosecutor makes false allegations against a defendant in the course of a trial, the opposing counsel is available to counteract immediately the damaging statements and an impartial panel of jurors is present to sift through the allegations and evidence to determine where the truth lies. Similarly, when a prosecutor engages in illegal conduct in the course of a trial, the judge, the jury, the opposing counsel, the witnesses, and the appellate process all serve in differing ways to mitigate the impact of that conduct. No comparable self-remedying mechanisms, however, exist outside the judicial phase of the criminal process, and thus there is more compelling need for private actions to serve as a means of vindicating constitutional rights.

Marrero, 625 F.2d at 509-10 (emphasis added). See also Gray, 712 F.2d at 501 (exclusionary sanction and professional discipline "are often hollow and ineffectual remedies"); Briggs, 569 F.2d at 24 (noting that four and one-half years had passed since the prosecutor's alleged misconduct without any official inquiry, the court concluded that criminal and professional penalties were likely to remain theoretical only). The inquiry into the presence of safeguards will, to some extent, track the initial inquiry with respect to the stage of the proceedings, since post-charging conduct is generally subject to much closer judicial and adversarial scrutiny. See Gray, 712 F.2d at 501.

3. Traditional Police Functions.

A final factor is whether the challenged conduct is typically performed by police officers. As noted earlier, the Supreme Court has adopted a functional rather than a status approach in determining whether a government official is absolutely immune for particular conduct. Prosecutors are entitled to absolute immunity only for functions that are closely connected with the judicial process, i.e., advocatory functions. On the other hand, police officers have never been accorded absolute immunity for their discretionary acts. Pierson v. Ray, 386 U.S. 547, 555, 87 S.Ct. 1213, 1218, 18 L.Ed.2d 288 (1967). A conclusion that a particular act is traditionally performed by the police indicates, therefore, that that act is not sufficiently connected with the judicial process to warrant absolute immunity, even though it may be performed by a prosecutor. As the Supreme Court stated in Butz, in discussing the need to strictly limit the scope of absolute immunity, "[i]t makes little sense to hold that a Government agent is liable for warrantless and forcible entry into a citizen's house in pursuit of evidence, but that an official of higher rank who actually orders such a burglary is immune simply because of his greater authority." 438 U.S. at 505-06, 98 S.Ct. at 2910. The Fifth Circuit similarly observed in Marrero that "[w]hen a prosecutor makes an investigative decision, such as whether to conduct a search and seizure, he is making a decision essentially comparable to that of a policeman" and there is "no reason why prosecutors deserve greater protection [than policemen] for the same kind of decisions...." 625 F.2d at 508.[18]

C.
Having explored how these three factors help determine whether a prosecutor's acts are absolutely or only qualifiedly immune from § 1983 liability, we now apply *857 them to the case before us. We conclude that Florey is not entitled to absolute immunity for his role in approving or directing the photo identification procedure, nor are Florey and Miller entitled to absolute immunity for their role in preparing affidavits for the Crim.P. 41.1 order and the June 6 arrest and search warrants.

1. The Photo Identification Procedure.

Florey is entitled only to qualified immunity for his role in either approving or directing the photo identification procedure in which only two photos, both of Higgs, were shown to Price. We note first that Florey's conduct occurred prior to the filing of criminal charges and, so far as the evidence shows, took place in the context of Rossmeisl's efforts to obtain information in support of arrest and search warrants. Moreover, there were no adversarial safeguards, such as defense counsel or an impartial judicial officer, to restrain or mitigate prosecutorial abuse. The only parties involved were Florey, Rossmeisl, and the complaining witness.
Whether Florey's conduct resembled traditional police activity is a more difficult question, since two different inferences may be drawn from Officer Rossmeisl's testimony concerning what Florey told him.[19] Either inference, however, supports the conclusion that Florey is not entitled to absolute immunity for his conduct. If one draws from the testimony the inference that Florey merely advised Officer Rossmeisl as to the propriety of an identification procedure suggested by Rossmeisl, Florey's conduct would not resemble a police officer's but rather would fall into the category of providing legal advice to the police, a prosecutorial function that we believe is more appropriately classified as administrative rather than advocatory. Alternatively, if Florey directed Rossmeisl to conduct a two-photo lineup, his actions would clearly resemble traditional police investigative actions, since it is the police who generally conduct identification procedures. Whether this activity is classified as administrative or investigative makes little difference, however, since both conclusions support qualified immunity only.

2. The Crim.P. 41.1 Nontestimonial Identification Order.

We have little difficulty in concluding that Florey and Miller are entitled to only qualified immunity for drafting the affidavit in support of the Crim.P. 41.1 order for nontestimonial identification evidence. The affidavit was drafted prior to the filing of criminal charges against Higgs and, in fact, at a point during the investigation when there was not probable cause to believe that Higgs had committed any crime. The purpose of obtaining the Crim.P. 41.1 order was to gather incriminating information to build a caseclearly an investigative function.
Moreover, although Crim.P. 41.1 requires that a nontestimonial identification order be issued by a judge, the order itself is issued in an ex parte proceeding upon an affidavit. As this case demonstrates, such a proceeding cannot provide an effective safeguard against the type of abuse that occurred here, since the judge will consider only those facts that the affiant chooses to include in the affidavit. Contrary to Florey and Miller's argument, the availability of a motion to suppress evidence is not an effective remedy against abuse, because the suppression motion, if filed at all, will come into play only after an arrest and the concomitant distress and damage to the accused's reputation that often follows the arrest. Furthermore, at a suppression hearing, the accused may not yet know what favorable evidence the prosecutorial or police officials withheld from *858 the affidavit supporting the order for nontestimonial identification evidence.
Finally, the preparation of an affidavit in support of an order for nontestimonial identification evidence is not significantly different from the preparation of an affidavit in support of a search warrant, a typical police function, e.g., McSurely, 697 F.2d 309, as Florey and Miller conceded in their testimony. There was evidence in the § 1983 trial to support the conclusion that, rather than simply providing legal advice as to the sufficiency of Rossmeisl's affidavit, Florey and Miller largely wrote the final affidavit and determined what information to include and how to characterize it. All these factors support the conclusion that the preparation of the affidavit supporting the Crim.P. 41.1 nontestimonial identification order was not sufficiently tied to the judicial phase of the formal criminal prosecution to warrant absolute immunity.

3. The Arrest and Search Warrant Affidavits.

The drafting of affidavits in support of an arrest warrant for Higgs and a search warrant for his home occurred prior to the filing of charges against Higgs. As in the case of the Crim.P. 41.1 nontestimonial identification order, the search warrant was issued for the purpose of gathering information to support the charges later filed against Higgs. The purpose of the arrest warrant is less clear, in that Higgs was not charged until two weeks after his arrest. Officer Rossmeisl, however, testified that it was normal procedure to simultaneously execute arrest and search warrants so as to prevent destruction of evidence. Viewed in light of this procedure, the issuance of the arrest warrant may also be seen as furthering the investigative function.[20] Again, although the affidavits were presented to a judge, the ex parte nature of the warrant proceeding does not provide the adversarial safeguards associated with the judicial phase of criminal proceedings.
Consideration of all three factors, therefore, supports the conclusion that Florey and Miller are not entitled to absolute immunity for drafting affidavits supporting the issuance of arrest and search warrants. On the contrary, Florey and Miller were only entitled to assert the defense of qualified immunity in connection with their activities relating to the photo identification procedure, the procurement of the Crim.P. 41.1 nontestimonial identification order, and the drafting of affidavits in support of the arrest and search warrants executed by the sheriff's officers.[21]

*859 IV.
We now consider separate challenges by both parties relating to the respondent court's order of a new trial on damages. We ordinarily will not review in an original proceeding the propriety of an order granting a new trial on damages. In this case, however, because we are reviewing the issue of prosecutorial immunity, considerations of judicial economy militate in favor of a review of issues relating to the respondent court's order for a new trial. See People in Interest of P.N., 663 P.2d 253 (Colo.1983) (prohibitory relief under C.A.R. 21 appropriate where trial court clearly abuses discretion in granting new trial).
Florey and Miller assert that the court grossly abused its discretion in limiting the new trial to damages only, because the jury's verdict may have been based on allegedly irrelevant and prejudicial evidence concerning events related to Higgs' prosecution that occurred after his arrest. They alternatively argue that, assuming the order of a new trial was not a gross abuse of discretion, the respondent court nonetheless abused its discretion in not limiting the evidence at the new trial to evidence of events occurring before Higgs' arrest. Higgs, in contrast, argues that the respondent court grossly abused its discretion in ordering a new trial on grounds of excessive damages because it thereby substituted its view of the evidence for the jury's. We consider these arguments separately.

A.
We first address Florey and Miller's claim that the admission of evidence concerning events occurring after Higgs' arrestspecifically, evidence of Higgs' alibis for April 12th and 15th, the absence of license plates on his pickup truck on April 17th, and Higgs' acquittal in the criminal trialmay have confused the jury as to what the district attorneys knew and when they knew it, thereby tainting the verdict on liability and rendering the respondent court's order granting a new trial on damages a gross abuse of discretion. We are unpersuaded by Florey and Miller's argument.
Apparently relying on the respondent court's denial of their pretrial in limine motion to exclude the challenged evidence of which they now complain, Florey and Miller did not object at the § 1983 trial to the admission of this evidence. Their reliance on the in limine ruling is misplaced, especially since the in limine motion was directed toward a broad array of evidence. The factors bearing on admissibility of any particular item of evidence, particularly its logical and legal relevancy, see CRE 401 and 403, can best be evaluated in the evidentiary state of the record at trial rather than in the artificial atmosphere of a pretrial motion. See Collins v. Wayne Corporation, 621 F.2d 777 (5th Cir.1980); People v. McClain, 60 Ill.App.3d 320, 17 Ill.Dec. 628, 376 N.E.2d 774 (1978). Simply put, denial of an in limine motion under these circumstances does not dispense with the obligation to make a contemporaneous objection to the evidence when offered at trial. CRE 103(a)(1); see, e.g., People v. Taggart, 621 P.2d 1375, 1386 (Colo.1981); People v. Jones, 193 Colo. 250, 255, 565 P.2d 1333, 1336-37 (1977), appeal dismissed, 434 U.S. 962, 98 S.Ct. 498, 54 L.Ed.2d 447 (1977). No such objection, however, was made in this case.
Moreover, the challenged evidence is clearly relevant to Higgs' damages. In the trial of a civil rights claim under 42 U.S.C. § 1983, "both federal and state rules on damages may be utilized, whichever better serves the policies expressed in the federal statutes." Sullivan v. Little Hunting Park, Inc., 396 U.S. 229, 240, 90 S.Ct. 400, 406, 24 L.Ed.2d 386 (1969); see also Baskin v. Parker, 602 F.2d 1205 (5th Cir.1979); 42 *860 U.S.C. § 1988 (1982).[22] Both federal and Colorado law recognize that compensatory damages include recovery for nonpecuniary injuries such as emotional distress, humiliation, embarrassment, personal indignity, loss of personal and business reputation, and loss of the enjoyment of life. Federal law sanctions recovery for these types of damages caused by a violation of constitutional rights. Carey v. Piphus, 435 U.S. 247, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978); Crawford v. Garnier, 719 F.2d 1317 (7th Cir.1983) (action under 42 U.S.C. § 1983); Corriz v. Naranjo, 667 F.2d 892 (10th Cir. 1981), cert. granted, 456 U.S. 971, 102 S.Ct. 2233, 72 L.Ed.2d 844, cert. dismissed per stipulation, 458 U.S. 1123, 103 S.Ct. 5, 73 L.Ed.2d 1394 (1982) (action under 42 U.S.C. § 1983); Flores v. Pierce, 617 F.2d 1386 (9th Cir.), cert. denied, 449 U.S. 875, 101 S.Ct. 218, 66 L.Ed.2d 96 (1980) (action under 42 U.S.C. § 1983); Baskin, 602 F.2d 1205 (action under 42 U.S.C. § 1983); Foster v. MCI Telecommunications Corp., 555 F.Supp. 330 (D.Colo.1983), aff'd, (10th Cir.1985); Bryant v. McGinnis, 463 F.Supp. 373 (W.D.N.Y.1978). Colorado also allows recovery for such losses under general tort law principles. E.g., Rugg v. McCarty, 173 Colo. 170, 476 P.2d 753 (1970); French v. Guyot, 30 Colo. 222, 70 P. 683 (1902); Guerrero v. Bailey, 658 P.2d 278 (Colo.App.1982); White v. Gates, 528 P.2d 982 (Colo.App.1974); Eiteljorg v. Bogner, 502 P.2d 970 (Colo.App.1972).
Generally, evidence which is admissible for one purpose does not become inadmissible simply because it might be irrelevant if offered for some other purpose. Spencer v. People, 163 Colo. 182, 429 P.2d 266 (1967); see CRE 105; see generally 21 C. Wright and K. Graham, Federal Practice and Procedure § 5062 (1977).[23] We conclude that, far from constituting a gross abuse of discretion, the admission of the challenged evidence was not erroneous and did not taint the jury's determination of liability in the § 1983 trial.

B.
We turn finally to Higgs' claim that the respondent court grossly abused its discretion in concluding that the jury's award was so grossly excessive as to warrant a new trial. Again, we look to both federal and state law for guidance. Sullivan, 396 U.S. at 240, 90 S.Ct. at 406. "[A]bsent an award so excessive or inadequate *861 as to shock the judicial conscience and to raise an irresistible inference that passion, prejudice, corruption or other improper cause invaded the trial, the jury's determination of the fact is considered inviolate." Hurd v. American Hoist and Derrick Co., 734 F.2d 495, 503 (10th Cir.1984), (quoting Barnes v. Smith, 305 F.2d 226, 228 (10th Cir.1962)); see also Blevins v. Cessna Aircraft Co., 728 F.2d 1576 (10th Cir.1984), cert. dismissed, ___ U.S. ___, 105 S.Ct. 32, 82 L.Ed.2d 923 (1984); Whiteley v. OKC Corporation, 719 F.2d 1051 (10th Cir.1982); Garrick v. City and County of Denver, 652 F.2d 969 (10th Cir. 1981); Burns v. McGraw-Hill Broadcasting Co., Inc., 659 P.2d 1351 (Colo.1983); Riss & Co. v. Anderson, 108 Colo. 78, 114 P.2d 278 (1941). A verdict may not be set aside on grounds of passion, prejudice, or corruption unless the damages are "`so outrageous as to strike everyone with the enormity and injustice of them.'" Burns, 659 P.2d at 1356 (quoting, Riss & Co., 108 Colo. at 85, 114 P.2d at 281); see also Malandris v. Merrill, Lynch, Pierce, Fenner & Smith, Inc., 703 F.2d 1152 (10th Cir.1981), cert. denied, 464 U.S. 824, 104 S.Ct. 92, 78 L.Ed.2d 99 (1983); Snowden v. Matthews, 160 F.2d 130 (10th Cir.1947). When the trial judge has made a finding that the excessive jury verdict resulted from bias, prejudice, or corruption, a new trial on all the issues is required; for once a jury verdict has been found to be so contaminated, it is virtually impossible to determine the degree to which those factors affected the jury generally and therefore influenced the determination of liability. Curtis Publishing Co. v. Butts, 388 U.S. 130, 160, 87 S.Ct. 1975, 1994, 18 L.Ed.2d 1094 (1966); Minneapolis St. Paul and Sault Ste. Marie Ry. Co. v. Moquin, 283 U.S. 520, 51 S.Ct. 501, 75 L.Ed. 1243 (1931); Malandris, 703 F.2d 1152; Burns, 659 P.2d 1351; Marks v. District Court, 643 P.2d 741 (Colo.1982). When the trial court, however, determines that the verdict was only excessive and not the result of bias, prejudice, or corruption, the court may order a remittitur and alternatively authorize a new trial on damages alone if the plaintiff refuses to accept the remittitur. Malandris, 703 F.2d 1152; Holmes v. Wack, 464 F.2d 86 (10th Cir.1972); Burns, 659 P.2d 1351; Marks, 643 P.2d 741; Leo Payne Pontiac, Inc. v. Ratliff, 178 Colo. 361, 497 P.2d 997 (1972); Kresse v. Bennett, 151 Colo. 549, 379 P.2d 807 (1963).[24]
Turning to the present case, we are satisfied that the jury's award was not so excessive as to warrant the grant of a new trial. The respondent court made no finding that the verdict was based on passion, prejudice, or corruption, but simply determined that the evidence did not support the award. In making this determination, the court focused solely on Higgs' specific pecuniary losses on which trial testimony was presented. The court gave no consideration to the trial testimony relative to Higgs' nonpecuniary losses or to the fact that, as found by the jury, he suffered a serious deprivation of his constitutional rights.
The record plainly shows that, in addition to a $20,000 loss incurred by Higgs in defense of the criminal charges, Higgs lost at least a year's worth of earnings due to his inability to apply himself to his insurance business as a result of the prosecution. His arrest and subsequent prosecution were reported in the newspapers and were discussed widely by his friends and neighbors, thereby subjecting him to embarrassment, humiliation, and loss of reputation. The uncontroverted testimony of various witnesses who testified on his behalf was that Higgs was so emotionally devastated by the prosecution and the attendant publicity that his personality underwent a profound deterioration. Once a trustee of his church, a successful and respected businessman, and an active and *862 outgoing member of the community, he was reduced to a withdrawn and bitter recluse who contemplated suicide. The record also shows that some of Higgs' emotional problems still remain. Finally, there was clear evidence that throughout the criminal investigation Higgs was deprived of basic constitutional rights.
[I]n cases involving constitutional rights, compensation "should not be approached in a niggardly spirit. It is in the public interest that there be a reasonably spacious approach to a fair compensatory award for denial or curtailment of the right...." Specifying such damages will always be difficult, but they must be at least "an amount which will assure (the plaintiff) that (personal) rights are not lightly to be disregarded and that they can be truly vindicated in the courts."
Halperin v. Kissinger, 606 F.2d 1192, 1208 (D.C.Cir.1979), (quoting Tatum v. Morton, 562 F.2d 1279, 1287 (D.C.Cir.1977)), aff'd by an equally divided court, 452 U.S. 713, 101 S.Ct. 3132, 69 L.Ed.2d 367, reh'g denied, 453 U.S. 928, 102 S.Ct. 892, 69 L.Ed.2d 1024 (1981); see also Corriz, 667 F.2d 892, 899. In light of all the evidence presented, we are satisfied that the jury properly performed its function under the law in its assessment of compensatory damages and that its award must be reinstated.
We also reinstate the award of exemplary damages. Section 13-21-102, 6 C.R.S. (1973), provides for an award of exemplary damages in tort actions for wrongs done to the person when "the injury complained of is attended by circumstances of ... wanton and reckless disregard of the injured party's rights and feelings." A party's right to exemplary damages must be proven beyond a reasonable doubt. § 13-25-127(2), 6 C.R.S. (1973). After noting that exemplary damages must bear a reasonable relationship to compensatory damages, the respondent court ruled that, because the compensatory award was to be set aside, the exemplary award should be overturned as well and reconsidered by a different jury. The respondent court clearly erred in this respect.
While it is true that exemplary damages must bear a reasonable relationship to compensatory damages, there is no precise formula for making this determination. Palmer v. A.H. Robins Co., Inc., 684 P.2d 187 (Colo.1984); Frick v. Abell, 198 Colo. 508, 602 P.2d 852 (1979); Carlson v. McNeill, 114 Colo. 78, 162 P.2d 226 (1945). The reasonableness of the award can be determined "by examining the facts of the case to discover if the jury was impermissibly motivated by prejudice or properly guided by the purposes for exemplary damages." Frick, 198 Colo. at 512; 602 P.2d at 854. The factors that guide the determination are: (1) the nature of the act that caused the injury; (2) the deterrent effect of the award on others; and (3) the economic status of the defendant. Palmer, 684 P.2d 187; Frick, 198 Colo. 508, 602 P.2d 852; Leo Payne Pontiac, Inc. v. Ratliff, 29 Colo.App. 386, 486 P.2d 477 (1971), rev'd on other grounds, 178 Colo. 361, 497 P.2d 997 (1972).
We noted in Palmer that high ratios of exemplary to compensatory damages have been upheld where the record shows that the jury was properly guided by the purposes of a punitive damages award in reaching its verdict. E.g., Mailloux v. Bradley, 643 P.2d 797 (Colo.App.1982) (ratios of 10:1 and 35:1 upheld); Vossler v. Richards Mfg. Co., Inc., 143 Cal.App.3d 952, 192 Cal.Rptr. 219 (1983) (20:1 ratio upheld); Ettus v. Orkin Exterminating Co., Inc., 233 Kan. 555, 665 P.2d 730 (1983) (24:1 ratio upheld); Leimgruber v. Claridge Associates, Ltd., 73 N.J. 450, 375 A.2d 652 (1977) (9.7:1 ratio upheld); Malco, Inc. v. Midwest Aluminum Sales, Inc., 14 Wis.2d 57, 109 N.W.2d 516 (1961) (15:1 ratio upheld). The punitive damages award in Palmer was ten times the amount of the compensatory damages award. 684 P.2d 187.
In the present case, there was ample evidence to support a determination that the actions of Florey and Miller involved "wanton and reckless disregard of *863 [Higgs'] rights and feelings." § 13-21-102, 6 C.R.S. (1973); see Smith v. Wade, 461 U.S. 30, 51, 103 S.Ct. 1625, 1637, 75 L.Ed.2d 632 (1983); City of Newport v. Fact Concerts, Inc., 453 U.S. 247, 101 S.Ct. 2748, 69 L.Ed.2d 616 (1981). There is nothing of record demonstrating that the jury acted out of passion or prejudice or that it was not properly guided by the purposes of an exemplary damages award.[25] Indeed, the cumulative amount of exemplary damages assessed against Florey and Miller was less than one third of the compensatory award. We cannot view the verdict as anything other than "the conscientious decision of a jury to punish a wrongdoer with a penalty commensurate with the seriousness of the misconduct and the financial ability of the offender to pay, and, concomitantly, to deter [Florey and Miller] and others from similar acts of misconduct in the future." Palmer, 684 P.2d at 221.

V.
In summary, we conclude that Deputy District Attorney Florey was not absolutely immune from § 1983 liability for his role in approving or directing the photo identification procedure in which Sandra Price identified Higgs as her assailant, and that Deputy District Attorneys Florey and Miller were not absolutely immune for their conduct in preparing affidavits in support of the Crim.P. 41.1 order for nontestimonial identification evidence, the arrest warrant for Higgs, and the search warrant for his home. We also conclude that the jury's damages awards were not so excessive as to warrant a new trial on either compensatory or exemplary damages. The respondent court, therefore, erred in setting aside the jury verdict in favor of Higgs and in granting a new trial on compensatory and exemplary damages. We accordingly make the rule absolute in Case No. 83SA493 and discharge the rule in Case No. 84SA19.
ROVIRA, J., concurs in the result.
ERICKSON, J., dissents.
ERICKSON, Justice, dissenting:
I respectfully dissent. In this original proceeding, the majority, in addressing a federal issue, has placed limitations on the absolute immunity that prosecutors are granted when claims are made against them under 42 U.S.C. § 1983 (1982). In my view, the defendants, deputy district attorneys Florey and Miller, are absolutely immune from liability for: (1) approving the photo identification procedure; (2) drafting affidavits to support a Crim.P. 41.1 nontestimonial identification order; and (3) assisting in the preparation of the arrest and search warrants.
Prior to the occurrence of the activities upon which liability in this case is premised, the investigation of the alleged crimes against Sandra Price focused on Ronald Higgs. Price reported being sexually assaulted by a man who wore a silver ring on the little finger of his right hand. Price told the police that the assailant had fled in a blue and white pickup truck. Police officers knew that Higgs owned a blue and white pickup truck and that he wore a silver ring on his little finger. Price also had identified Higgs as the assailant after viewing a photo lineup. Florey and Miller, as deputy district attorneys, were carrying out the investigative duties that were necessary to determine whether charges should be filed against Higgs.
The American Bar Association's Standards Relating to the Prosecution Function (1979) set forth the duties and responsibilities of a prosecutor. It is the duty of *864 a prosecutor to provide legal advice to the police concerning police functions and duties in criminal matters. ABA Standards Relating to the Prosecution Function § 3-2.7 (1979). The decision to charge is also the primary responsibility of the prosecutor and in most instances the police should obtain the approval of the prosecutor before seeking an arrest warrant or a search warrant. ABA Standards Relating to the Prosecution Function § 3-3.4 (1979). The prosecutor necessarily must be granted broad discretion in making the charging decision. ABA Standards Relating to the Prosecution Function § 3-3.9 (1979).
A prosecutor is absolutely immune from civil liability in an action brought pursuant to 42 U.S.C. § 1983 (1982) for initiating and trying a criminal case. Imbler v. Pachtman, 424 U.S. 409, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976). Imbler recognizes that absolute immunity may extend to the actions of the prosecutor which precede the filing of charges. 424 U.S. at 431 n. 33, 96 S.Ct. at 995 n. 33. A number of lower courts have held that efforts by a prosecutor to obtain information necessary to make the decision to file charges are protected by absolute immunity. See, e.g., Ybarra v. Reno Thunderbird Mobile Home Village, 723 F.2d 675 (9th Cir.1984); Simons v. Bellinger, 643 F.2d 774 (D.C.Cir.1980); Atkins v. Lanning, 556 F.2d 485 (10th Cir.1977).
The reasons set forth in Imbler for granting absolute immunity apply to this case. I would not employ the majority's bright-line rule to deprive the prosecutors of immunity for claims made pursuant to section 1983 merely because charges had not been filed against Higgs. I find little support in the federal cases for the "filing of charges" test. For example, in Atkins v. Lanning, 556 F.2d at 485, a district attorney was held absolutely immune from liability under section 1983 based upon his failure to correctly spell the name of a criminal suspect in an arrest warrant which was prepared before any suspect was charged with a crime. Similarly, Simons v. Bellinger, 643 F.2d at 774, held that purely investigative activities prior to the filing of charges by the District of Columbia Unauthorized Practice of Law Committee were absolutely immune from suit under section 1983.
The majority's assertion "that the decision to file charges against a particular person, because of its accusatorial overtones, carries a qualitatively greater risk of inciting retaliatory litigation than precharging decisions" (713 P.2d at 854) is certainly not supported by the facts in the present case. All of Higgs' section 1983 damage claims are based entirely on alleged prosecutorial wrongdoing which occurred before criminal charges were filed against him.
The majority's interpretation of the "functional test" for prosecutor immunity goes beyond what was contemplated by Imbler and the subsequent cases which created the functional test. The majority would give absolute immunity under section 1983 when a prosecutor acts in an "advocatory" capacity but only qualified immunity when a prosecutor acts in an "investigative" capacity. Limiting the liability of a prosecutor acting in an investigative capacity will cause prosecutors to cooperate less with the police and will force the police to obtain independent counsel or to act without the advice of those knowledgeable in the law. In my view, the police should be encouraged to consult with and obtain the advice of prosecutors.
The "traditional police function" test relied on by the majority also goes beyond any statement yet made by the United States Supreme Court. The majority states that if any particular prosecutorial activity, for example the investigation of criminal activity, is a function traditionally performed by police, the prosecutorial conduct is automatically not quasi-judicial and is not due the absolute immunity of Imbler. I fail to see why "traditional police functions" and "quasi-judicial functions" must be mutually exclusive categories in all cases. See Comment, Section 1983 and Prosecutorial Immunity: Marrero v. City of Hialeah, 19 Am.Crim.L.Rev. 81 (1981); *865 Comment, Supplementing the Functional Test of Prosecutorial Immunity, 34 Stan. L.Rev. 487 (1982).
Atkins, 556 F.2d at 485, and Simons, 643 F.2d at 774, held that prosecutorial investigation which is integral to the preparation of the prosecution's case and which focuses on whether prosecution is warranted against a particular suspect is quasi-judicial conduct absolutely immune from section 1983 suit. Such prosecutorial investigation is apparently exactly the conduct that the majority in the present case would classify as a "traditional police function" undeserving of Imbler immunity.
I agree with the majority that the availability of alternate remedies to deter and rectify prosecutorial misconduct should be considered in determining whether absolute immunity should be granted to a prosecutor in a particular case. The adversarial trial process, the use of evidentiary and exclusionary rules, rules of professional discipline, and even the possibility of criminal liability on the part of the prosecutor are all possible alternative remedies for prosecutorial misconduct rather than damages under section 1983. See Butz v. Economou, 438 U.S. 478, 515-16, 98 S.Ct. 2894, 2915, 57 L.Ed.2d 895 (1978).
Prosecutorial investigation prior to the filing of charges necessarily focuses on whether charges are warranted and is, in my view, conduct which is absolutely immune from liability under section 1983.
In the present case, Florey and Miller should be absolutely immune from liability under section 1983 for all of the acts alleged by Higgs. The approval of the photo lineup, the drafting of the affidavit in support of the Crim.P. 41.1 nontestimonial identification evidence order, and the drafting of affidavits in support of an arrest warrant for Higgs and a search warrant for Higgs' house were all investigative activities to gather evidence to determine whether prosecution was warranted against Higgs. Barriers should not be erected to prevent a prosecutor from exercising free and unfettered judgment in determining whether a charge should be filed. Sandoval v. Farish, 675 P.2d 300 (Colo. 1984). "[H]arassment by unfounded litigation would cause a deflection of the prosecutor's energies from his public duties, and the possibility that he would shade his decisions instead of exercising the independence of judgment required by his public trust." Imbler, 424 U.S. at 423, 96 S.Ct. at 991.
For the reasons set forth in this dissent, I would affirm the district court's judgment setting aside the verdicts against Florey and Miller on the grounds of absolute immunity.
NOTES
[1] § 18-4-202, 8 C.R.S. (1978 & 1984 Supp.).
[2] § 18-3-402, 8 C.R.S. (1978 & 1984 Supp.).
[3] § 18-4-502, 8 C.R.S. (1978).
[4] In the initial complaint, Ronald Higgs brought claims of malicious mistaken identification, conspiracy to violate civil rights, and intentional infliction of emotional distress against Sandra Price, her husband Richard Price, Officers Rossmeisl, Rozycki, and Smith, and Deputy District Attorneys Miller, Florey, and Peters. In addition, Higgs brought claims against Sandra Price, Richard Price, and the deputy district attorneys for malicious prosecution. Higgs also asserted claims against Sandra Price, Richard Price, and the officers for negligent identification, claims against the officers and the deputy district attorneys for false arrest and for violation of his constitutional rights under 42 U.S.C. § 1983, and claims of prosecutorial malpractice and breach of statutory bonds against the three deputy district attorneys. Mary Higgs joined her husband in the claim of intentional infliction of emotional distress and asserted her own claim for loss of consortium against all eight defendants. With the exception of the malicious prosecution and loss of consortium claims, all claims against Sandra Price were dismissed by the trial court. The loss of consortium claim against Sandra Price was voluntarily withdrawn prior to trial. As noted above in the text, Sandra Price was ultimately found liable on the malicious prosecution claim. All claims against Richard Price, except the conspiracy claim, were dismissed by the trial court under C.R.C.P. 12. The conspiracy claim was dismissed at the close of the plaintiff's case. Except for the claims under § 1983, all claims against Officers Rossmeisl, Rozycki, and Smith were dismissed. Rossmeisl and Rozycki were found liable on the § 1983 claim. Smith was exonerated of all liability under this claim. All claims against Miller and Florey, with the exception of the claim under § 1983 and the claim for breach of statutory bonds, were dismissed by the trial court. The claim for breach of statutory bonds was voluntarily withdrawn from the case prior to trial. Miller and Florey were eventually found liable on the § 1983 claim. All claims against Deputy District Attorney Peters were dismissed by stipulation of the parties prior to trial.
[5] Apparently, no snow had accumulated on the sidewalk or driveway. Price testified that the rapist left by the front door and that she was fairly certain he must have entered the garage by the side door. It is not clear from the record whether the rapist would have had to walk through the snow to gain entry to the garage.
[6] Higgs had retained the license plates from his old vehicle when he purchased the blue and white pickup in April 1978, and he transferred these plates to his new truck. Higgs introduced into evidence a work order from the car dealership where he had purchased the truck indicating that the dealer's service department installed the license plates on May 5, 1978. It appears from the record that the Douglas County Sheriff's Office limited its list of suspects to persons living in the Acres Green subdivision.
[7] The sheriff's officers had initially responded to a call from one of Price's neighbors reporting a suspicious vehicle resembling the assailant's pickup truck driving slowly along the street on which Price and the neighbor lived. When the officers arrived, they talked with the neighbor who had reported the suspicious vehicle. He told the officers at that time that the pickup truck had headed out of the Acres Green subdivision and turned east onto Colorado Highway 470. The neighbor then gave chase in his own vehicle, and the sheriff's officers followed the neighbor out to the highway, but turned around after a short while. Upon reentering the subdivision, they encountered Higgs and his wife in Higgs' truck. Because the Acres Green subdivion has only one exit, the sheriff's officers knew that Higgs' truck could not have been the suspicious vehicle reported by the neighbor, but they nonetheless stopped Higgs.
[8] Crim.P. 41.1 provides in pertinent part:

(a) Authority to Issue Order. A nontestimonial identification order authorized by this Rule may be issued by any judge of the Supreme, District, Superior, County Court, or Court of Appeals.
* * * * * *
(c) Basis for Order. An order shall issue only on an affidavit or affidavits sworn to or affirmed before the judge and establishing the following grounds for the order:
(1) That there is probable cause to believe that an offense has been committed;
(2) That there are reasonable grounds, not amounting to probable cause to arrest, to suspect that the person named or described in the affidavit committed the offense; and
(3) That the results of specific nontestimonial identification procedures will be of material aid in determining whether the person named in the affidavit committed the offense.
The sheriff's office wanted body fluid samples from Higgs for use in analyzing whether he could have deposited the semen found on Price's panties after the first rape. The CBI analysis showed that Higgs was in the 88% of the male population that could theoretically have deposited the semen. In fact, however, Higgs underwent a successful vasectomy in 1970 and thus could not have deposited the fertile semen found on the panties.
[9] The affidavit, for example, made no mention that the rape examination of Sandra Price showed no physical evidence of sexual assault or that there was no physical evidence recovered which corroborated Price's allegations. Furthermore, although Officer Rossmeisl had reported Price's photo identification as being "tentative," the affidavit indicated that Price was certain that Higgs was the assailant.
[10] Hospital personnel at Swedish Medical Center requested that Price's husband also submit hair samples for comparison. He did, but pursuant to orders from the district attorney's office, these samples were never compared against the hair found at the scene.
[11] Shortly before a hearing in the criminal trial on Higgs' motion to suppress Price's photo identification, Officer Rossmeisl apparently informed Deputy District Attorney Florey that the underwear found on the floor of Price's bedroom and tested by the CBI had not been worn by Price after the rape. Any comparison, therefore, between Higgs' body fluids and the semen deposit on the panties would have been irrelevant, since the semen would obviously have been deposited on the panties prior to the alleged rape of April 15. It is not clear from the record why the sheriff's officers and the district attorneys initially believed that Price had worn the panties after the first rape. At the hearing, the People requested that the trial judge strike from all three affidavits any reference to the underwear or the semen and determine whether the affidavits still supported a finding of probable cause. The trial judge found that even without the stricken statements, the affidavits supported a finding of probable cause.
[12] Specifically, Florey and Miller argue that (1) their acts were sufficiently adversarial that they would likely result in retaliatory litigation; (2) their conduct elicited information necessary to the decision to prosecute; (3) the acts occurred in the context of an investigation that had focused on a single suspect; (4) sufficient safeguards existed to prevent prosecutorial abuse of these activities; and (5) the harm alleged by Higgs resulted from the trial process and, as such, is shielded by immunity.
[13] In Stump v. Sparkman, 435 U.S. 349, 98 S.Ct. 1099, 55 L.Ed.2d 331 (1978), the Supreme Court gave an example of what "clear absence of all jurisdiction" means:

If a probate judge, with jurisdiction over only wills and estates, should try a criminal case, he would be acting in a clear absence of jurisdiction and would not be immune from liability for his actions; on the other hand, if a judge of a criminal court should convict a defendant of a nonexistent crime, he would merely be acting in excess of his jurisdiction and would be immune.
435 U.S. at 357 n. 7, 98 S.Ct. at 1105 n. 7 (paraphrasing Bradley v. Fischer, 80 U.S. (13 Wall.) 335, 352, 20 L.Ed. 646 (1872).
[14] It was against this common-law backdrop of absolute judicial immunity that the Supreme Court in Pierson v. Ray, 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967), determined that Congress did not intend to abrogate this common-law immunity in enacting 42 U.S.C. § 1983. The court accordingly conferred absolute immunity on judges in § 1983 actions based on judicial acts that allegedly violated the plaintiff's federal constitutional or statutory rights, even though 42 U.S.C. § 1983 provides that "[e]very person ... shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress." (emphasis added).
[15] Because the prosecutor's role as an advocate necessarily puts him in an antagonistic position regarding the defendant, the prosecutor, like the judge, is a likely target of a retaliatory lawsuit. The threat of liability from such suits would constrain the prosecutor's judgment in "deciding which suits to bring and in conducting them in court," Imbler v. Pachtman, 424 U.S. 409, 424, 96 S.Ct. 984, 992, 47 L.Ed.2d 128 (1976), and would in turn impair the operation of the criminal justice system. Prosecutors in such instances would be reluctant to pursue any but the most airtight cases. Additionally, prosecutors, fearful of personal liability for presenting false testimony, would be reluctant to call witnesses of uncertain veracity, with the result that juries would be deprived of probative evidence and the truth-seeking function of trials concomitantly impaired. Id. at 426-27, 96 S.Ct. at 993. Appellate review and the use of post-conviction collateral remedies would also be affected, since the reviewing judge would know that a "post-trial decision in favor of the accused might result in the prosecutor's being called upon to respond in damages for his error or mistake in judgment." Id. at 427, 96 S.Ct. at 993.

As the Imbler court recognized, absolute immunity for quasi-judicial acts does not mean that prosecutors will necessarily escape punishment for their misconduct, since criminal sanctions are available, 18 U.S.C. § 242 (1982) (criminal offense to willfully, under color of law, subject a person to deprivation of rights protected by constitution or laws of United States), and since prosecutors, like other lawyers, are subject to professional discipline for misconduct.
[16] In view of the standard of objective reasonableness underlying the qualified immunity defense, it follows that "bare allegations of malice should not suffice to subject governmental officials either to the costs of trial or the burdens of broad-reaching discovery" incident to a § 1983 action. Harlow v. Fitzgerald, 457 U.S. 800, 817-18, 102 S.Ct. 2727, 2737-38, 73 L.Ed.2d 396 (1982). This standard of objective reasonableness will thus permit a court to resolve an insubstantial § 1983 claim by summary judgment, a remedy generally unavailable under a subjective good faith standard. As the Court observed in Harlow:

Reliance on the objective reasonableness of an official's conduct, as measured by reference to clearly established law, should avoid excessive disruption of government and permit the resolution of many insubstantial claims on summary judgment. On summary judgment, the judge appropriately may determine, not only the currently applicable law, but whether that law was clearly established at the time an action occurred. If the law at that time was not clearly established, an official could not reasonably be expected to anticipate subsequent legal developments, nor could he fairly be said to "know" that the law forbade conduct not previously identified as unlawful. Until this threshold immunity question is resolved, discovery should not be allowed. If the law was clearly established, the immunity defense ordinarily should fail, since a reasonably competent public official should know the law governing his conduct. Nevertheless, if the official pleading the defense claims extraordinary circumstances and can prove that he neither knew nor should have known of the relevant legal standard, the defense should be sustained. But again, the defense would turn primarily on objective factors.
457 U.S. at 818-19, 102 S.Ct. at 2738.
[17] The dissenting opinion reads our decision as adopting a "bright-line rule" that turns the resolution of immunity issue on whether the prosecutor's conduct in question occurred prior to or subsequent to the formal filing of criminal charges. Dissenting op. at 864. Our decision, however, expressly recognizes that there is "no litmus test that will unequivocally resolve" the immunity issue, at 853, and that "there may be instances where absolute immunity will apply to a prosecutor's conduct that occurs prior to the filing of criminal charges," at 855. Far from establishing a "bright-line rule" bottomed on the filing decision, our functional approach merely considers the temporal relationship of the challenged prosecutorial conduct to the filing decision as one factor in determining whether the conduct is sufficiently identified with the judicial phase of the criminal process as to be classified as advocatory in character and thus absolutely immune.
[18] See also Hampton v. City of Chicago, 484 F.2d 602, 609 (7th Cir.1973) cert. denied, 415 U.S. 917, 94 S.Ct. 1414, 39 L.Ed.2d 471 (1974) ("the State's Attorney's alleged participation in the planning and execution of a raid of this character has no greater claim to complete immunity than activities of police officers allegedly acting under his direction"); J.D. Pflaumer, Inc. v. United States Department of Justice, 450 F.Supp. 1125, 1135 (E.D.Pa.1978) (extending absolute immunity "to the investigatory aspects of the prosecutor's duties would permit the prosecutor an absolute immunity for precisely the same conduct for which police officers have traditionally been entitled to only a qualified immunity").
[19] At one point in his testimony Officer Rossmeisl acknowledged that he had a discussion with Florey about the propriety of showing the two color photographs of Higgs to the complaining witness, Sandra Price, and that he said "it would be all right to show her the photographs." On another occasion Rossmeisl testified that he contacted Florey about the appropriateness of the two photo lineup, that Florey advised him about the propriety of the lineup, that Rossmeisl "felt compelled to conform [his] conduct to such advice," and that he acted on that advice.
[20] The defendants cite Lerwill v. Joslin, 712 F.2d 435 (10th Cir.1983), for the proposition that procuring an arrest warrant places the prosecutor in the role of an advocate before a judge, and thus is absolutely immune. Lerwill is distinguishable from the case before us since the attorney there sought the arrest warrant after the filing of formal criminal charges in order to secure the defendant's presence at trial. Those facts led the court to conclude that the arrest warrant was part of "the initiation of a prosecution" under Imbler v. Pachtman, 424 U.S. 409, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976). Here, by contrast, Higgs was arrested roughly two weeks before he was charged. Under these circumstances, we find it difficult to conclude that his arrest was "part of the initiation of the prosecution." See Rex v. Teeples, 753 F.2d 840 (10th Cir.1985) (deputy district attorney's presence at pre-charging police interrogation, in order to ensure that suspect was properly advised of and waived Miranda rights, constituted nonadvocatory, investigative activity which entitled attorney to qualified immunity only).
[21] Contrary to the dissenting opinion, the rule of qualified immunity adopted herein is neither intended to nor should result in impeding a district attorney from giving appropriate legal advice to police officers in investigative matters. Section 3-2.7(a) of the ABA Standards Relating to the Prosecution Function (1979) encourages the prosecutor to provide such advice to the police. As long as the legal advice is objectively reasonable as measured by existing statutory and constitutional law, a prosecutor has no reason to fear a § 1983 claim based on that advice. See Harlow v. Fitzgerald, 457 U.S. 800, 817-20, 102 S.Ct. 2727, 2737-39, 73 L.Ed.2d 396 (1982). The basic flaw in the dissent's proposed rule of absolute immunity is that it would totally immunize a prosecutor for such egregious precharging misconduct as obtaining a search or arrest warrant or Crim.P. 41.1 order on the basis of information known by the prosecutor to be false. A rule of absolute immunity for such misconduct is far more expansive than is required to safeguard the independence of the prosecutor with respect to those functions that are truly quasi-judicial in character and, even more important, hardly comports with the basic purpose of 42 U.S.C. § 1983, which is to provide a person with legal redress for lawless misconduct by a public official that is a clear violation of the person's constitutional or statutory rights. See Harlow, 457 U.S. at 819, 102 S.Ct. at 2738.
[22] 42 U.S.C. § 1988 (1982) states in pertinent part:

The jurisdiction in civil ... matters conferred on the district courts by the provisions of this Title, and of the Title "CIVIL RIGHTS," and of the Title "CRIMES," for the protection of all persons in the United States in their civil rights, and for their vindication, shall be exercised and enforced in conformity with the laws of the United States, so far as such laws are suitable to carry the same into effect; but in all cases where they are not adapted to the object, or are deficient in the provisions necessary to furnish suitable remedies and punish offenses against law, the common law, as modified and changed by the constitution and statutes of the State wherein the court having jurisdiction of such civil or criminal cause is held, so far as the same is not inconsistent with the Constitution and laws of the United States, shall be extended to and govern the said courts in the trial and disposition of the cause.... (emphasis added).
[23] The rule of multiple admissibility is, of course, limited by CRE 403, which provides that relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice. The respondent court, however, instructed the jury as to which acts of Florey and Miller might have constituted violations of Higgs' civil rights and, also, that those acts were to be judged in light of the information available at the time of their commission, not with the aid of hindsight. The court also instructed the jury that in considering the claim against Sandra Price, the fact that Higgs was acquitted did not prove she had no probable cause to file her complaint with the sheriff's office. Though not directed to Higgs' § 1983 claim against Florey and Miller, this instruction generally alerted the jury to the fact that they were not bound by the outcome of the criminal trial in resolving the issues before them. Considered cumulatively, the jury instructions sufficiently mitigated any danger of prejudice posed by the evidence.
[24] When an award of damages is excessive but liability is certain, it may be permissible to order a new trial on the issue of damages only. Marks v. District Court, 643 P.2d 741 (Colo. 1982); Denton v. Navratil, 170 Colo. 158, 459 P.2d 761 (1969); King v. Avila, 127 Colo. 538, 259 P.2d 268 (1953); Murrow v. Whitely, 125 Colo. 392, 244 P.2d 657 (1952).
[25] The respondent court's instruction on exemplary damages was as follows:

If you find in favor of the plaintiff, Ronald J. Higgs, and award him actual damages, then you should consider whether the plaintiff is entitled to exemplary damages. If you also find beyond a reasonable doubt that the injury complained of was attended by circumstances of fraud, malice, or insult or a wanton or reckless disregard of the rights and feelings of the plaintiff, then in addition to any actual damages, you may also award the plaintiff a reasonable sum as exemplary damages.
Exemplary damages are not to be construed as compensation to the plaintiff for wrong done, but as punishment to the defendant, and as an example to others.