No. 14,723.

Riss and Company, Inc. *v.* Anderson.
(114 P. [2d] 278)

Decided April 14, 1941.   Rehearing denied June 16, 1941.

Mr. JOHN F. MUELLER, for plaintiff in error.

Mr. A. T. STEWART, Mr. S. S. PACKARD, for defendant in error.

*In Department.*

MR. JUSTICE YOUNG delivered the opinion of the court.

IN the district court defendant in error, plaintiff there, recovered judgment in the amount of $25,303.50 against plaintiff in error, defendant, for damages proximately caused by the negligent operation of defendant's truck. Defendant seeks a reversal of the judgment.

October 1, 1936, plaintiff, while in Avondale, was hit by defendant's truck as he stood near the service truck belonging to the telephone company, his employer, and was carried a distance of 310 feet from the point of impact over into a church yard. He was seriously injured.

It is pertinent to state that defendant stipulated that for the purposes of this case it might be assumed that the injuries sustained by plaintiff were proximately caused by its negligence and that the inquiry on the trial might be limited to the extent of the injuries and the damages occasioned thereby.

Numerous errors are assigned, but they may be considered, as defendant groups them in its brief, under three heads, namely, that error was committed in admitting in evidence certain photographs and the mortality tables; in overruling defendant's defense that plaintiff had accepted hospitalization, medical services, and full wages for thirteen weeks and thereafter half the amount of the wages he was drawing at the time of the accident, up to the time of trial, under a benefit plan of the Mountain States Telephone and Telegraph Company by which plaintiff was employed at the time of the accident, and that this deprived him of the right to sue, and vested that right, under section 366, chapter 97, '35 C.S.A., in the telephone company; that the verdict is so excessive as to indicate that the jury in rendering it misconceived the evidence and were actuated by passion and prejudice.

We have examined the entire record and are convinced that the photographs of the plaintiff taken while in his bed at the hospital and including the rather elaborate mechanical apparatus used in surgically treating him could have had no effect, other than to convey to the jurors by visual perception the same facts to which the surgeon in attendance testified in detail, and that defendant was not and could not have been prejudiced by their admission in evidence.

We also have considered the matter of the admission in evidence of the mortality tables contained in our statutes—'35 C.S.A., chapter 63, section 3—showing that at plaintiff's age, twenty-four at the time of the accident, he had a life expectancy of 39.49 years. Section 2 of this chapter provides: "In all civil actions,

special proceedings or other modes of litigation in courts of justice or before referees or other persons having power and authority to receive evidence, whenever it shall be necessary to establish the expectancy of continued life of any person from any period of such person's life, whether he be living at the time or not, the table set out in the next succeeding section hereof shall be received as evidence, together with other evidence as to health, constitution, habits and occupation of such person of such expectancy."

Defendant predicates its objection to the admission of this evidence on the ground that there is no evidence of plaintiff's having sustained any permanent injury. The record does not warrant such an assumption. In *Rio Grande Southern R. R. Co. v. Nichols,* 52 Colo. 300 (123 Pac. 318) we said: "The law is, if there is evidence from which the jury may find that the injury is permanent, the table is admissible. If the jury finds it is permanent, the table is not conclusive, but may be considered together with other evidence as to health, habits, condition, etc., of the injured party in arriving at the damages."

■■ The second contention of defendant is based on section 366, chapter 97, '35 C.S.A., which is as follows: "If any employee entitled to compensation under this article be injured or killed by the negligence or wrong of another not in the same employ, such injured employee, or in case of death, his dependents, shall before filing any claim under this article, elect in writing whether to take compensation under this article or to pursue his remedy against such other. Such elections shall be evidenced in such manner as the commission may by rule or regulation prescribe. *If such injured employee,* or in case of death, his dependents, *elect to take compensation under this article, the awarding of compensation shall operate as and be an assignment of the cause of action against such other to the industrial commission of Colorado if compensation be payable from*

*the state compensation insurance fund, and otherwise to the person, association, corporation, or insurance carrier liable for the payment of such compensation;* however, said insurance carrier shall not be entitled to recover any sum in excess of the amount of compensation for which said carrier is liable under this article to the injured employee, but to that extent said carrier shall be subrogated to the rights of the injured employee against said third party causing the injury; if the injured employee elects to proceed against such other, the state compensation insurance fund, person, association, corporation or insurance carrier, as the case may be, shall contribute only the deficiency, if any, between the amount of the recovery against such other person actually collected, and the compensation provided by this article in such case. Such a cause of action assigned to the commission may be prosecuted or compromised by it. A compromise of any such cause of action by the employee or his dependents at an amount less than the compensation provided for by this article shall be made only with the written approval of the commission, if the deficiency of compensation would be payable from the state compensation insurance fund, and otherwise with the written approval of the person, association, corporation, or insurance carrier, liable to pay the same. * * *"

The record is not clear that the so-called telephone company benefit plan is self-insurance under the Workmen's Compensation Act, but we shall assume that it is. Even so, we are of the opinion that it can avail the defendant nothing. In the fully considered case of *King v. O. P. Baur Confectionery Co.,* 100 Colo. 528, 68 P. (2d) 909, we held that "an action by the injured employee against a third party is not precluded by the receipt of payments from the employer or the insurance carrier." We held further in that case that until compensation is awarded there was no assignment of the cause of action against a third party tort-feasor and that the mere acceptance of payments and medical treatments did not

constitute an awarding of compensation within the meaning of the statute. The defendant may protect itself as between the plaintiff and the telephone company if, after our holding in *King v. O. P. Baur Confectionery Co., supra,* it has any question as to the telephone company having an interest in the judgment. Under the circumstances of this case it is of no concern of the third party tort-feasor whether, as between the plaintiff and his employer, the telephone company, the latter is relieved from further contribution under its benefit plan. The statute itself contemplates that if the employee shall elect to sue a third party he may then recover from the compensation insurance carrier only the deficiency between the judgment thus procured and the amount of compensation benefits to which he is entitled; and that if *after* an award of compensation the insurance carrier shall, as a statutory assignee of the claim, sue and recover more than the award of compensation, the excess shall belong to the injured employee. It is apparent that the statute relied upon is not designed to relieve a third party from the consequence of injuries to another negligently inflicted, but merely affords a means of adjusting rights as between the injured employee and his employer, who also may be burdened as a consequence of the negligence of another which he could not foresee or prevent. What was said in *Froid v. Knowles,* 95 Colo. 223, 36 P. (2d) 156—quoted also in *King v. O. P. Baur Confectionery Co., supra*—is in point here: "What plaintiff received from or through his employer resulted from relation; what he seeks from defendant is based on the latter's alleged fault. To the Workmen's Compensation Act, the purpose of which is 'to determine, define and prescribe the relations between employer and employe,' defendant was as a stranger. 'An outsider does not share the burdens of the act, imposed upon the employer, and he is entitled to none of its benefits.' *Hotel Equipment Co. v. Liddell,* 32 Ga. App. 590, 124 S.E. 92." The purpose of the statute is merely to prescribe how a fund

resulting from the payment of damages by one who negligently causes them shall be divided between the one who is the primary victim of the negligence and his employer, who may, because of the employer-employee relationship become a secondary victim of the same negligence.

It is urged that the amount received under the so-called benefit plan should be considered in mitigation of damages. If the benefit plan is in fact in lieu of workmen's compensation insurance, clearly, for the reasons stated, it should not be so considered. If it is not in lieu of workmen's compensation insurance, but is a part of the compensation of plaintiff as an employee of the telephone company, then he bought and paid for such insurance as clearly as though he had purchased an accident policy. In such case a tort-feasor may not plead his victim's prudence and foresight to relieve him from the consequences of his own wrong.

There remains for consideration the alleged excessiveness of the verdict. At the outset it may clarify the issue to point out that this problem is to be approached solely from the standpoint of the extent of the injuries and resulting damage apart from any consideration of whether plaintiff drew workmen's compensation or was or is entitled under the law to the same, or whether the benefits under the telephone company plan were a part of the compensation for his work, and thus in effect an accident policy procured on his own initiative. If the first situation obtains, since the judgment is productive of a sum in excess of the maximum amount which could be awarded under the Workmen's Compensation Act, the right to compensation from the insurance carrier ceases under the statute, and defendant can have no benefit from it. If the second condition obtains, i.e., if plaintiff in effect bought an accident policy, he rightly receives a benefit therefrom and that is merely his good fortune. His action in that respect added no burden to defendant, and having carried no

liability, the latter can predicate no advantage thereon.

In *Colorado Springs & Interurban R. R. Co. v. Kelley,* 65 Colo. 246, 176 Pac. 307, we outlined the proper approach to the problem, saying:

"As relates to the contention of excessive damage, we must bear in mind and be governed by the rule laid down by Chancellor Kent more than a century since, and generally adhered to by all courts, and by this court; that it is exclusively the province of the jury to estimate and assess the damages, and that the amount to be allowed in such cases rests largely in their sound discretion. He said:

" 'The question of damages was within the proper and peculiar province of the jury. It rested in their sound discretion, under all the circumstances of the case, and unless the damages are so outrageous as to strike everyone with the enormity and injustice of them, and so as to induce the court to believe that the jury must have acted from prejudice, partiality or corruption, we cannot, consistently with the precedents, interfere with the verdict. It is not enough to say, that in the opinion of the court, the damages are too high, and that we would have given much less. It is the judgment of the jury and not the judgment of the court, which is to assess the damages in actions for personal torts and injuries.'

"And as was well said by Justice Story in *Thurston v. Martin,* 5 Mason 497, Fed. Cas. No. 14018:

" 'It is one thing for a court to administer its own measure of damages in a case properly before it, and quite another thing to set aside the verdict of a jury because it exceeds that measure.'

"No case has been cited from this court and we know of none, wherein there has been a departure from the rule stated."

Our reading of the record convinces us, as doubtless the evidence convinced the jury and the trial court who saw the plaintiff and the witnesses and heard them testify, that plaintiff was seriously and permanently in-

jured and that he endured, as incident thereto, prolonged and severe pain and suffering; that by reason of his injuries he is and permanently will be, physically incapacitated, and unable in the future to engage in the kind and character of heavy labor in which he was employed and which is the only kind of work for which he is fitted by education and training to perform. The evidence discloses that he was a young man, twenty-four years of age, of fine physique and in splendid health, who had participated in athletics. Twice he passed the thorough physical examination—the last time on May 16, 1936—required of men engaged in heavy construction work for the Colorado Fuel and Iron Company. At the completion of a days work in such employment his testimony is that he did not feel particularly tired. The examination disclosed nothing wrong with his heart. He was employed by the Mountain States Telephone and Telegraph Company in construction work, involving the climbing of poles, at the time of his accident. He commenced working at a salary of $16 a week, which had been increased to $17.50 at the time of the accident, with every reasonable prospect of progressing by regular increases to a wage of $25 per week. As heretofore stated plaintiff was hit by defendant's truck as he stood near the service truck of the telephone company, and was carried a distance of 310 feet from the point of impact over into a church yard. Here he was taken from the truck where he had lodged, placed on the ground, and covered with blankets. Fellow workmen testified that he was covered with blood and quivered and shook as he lay there. He was not moved until a doctor and an ambulance arrived from Pueblo, which was more than an hour. His face was lacerated and his neck cut, resulting in some scars. He was bruised all over. Upon arrival at the hospital in Pueblo he was made easy with opiates, face and neck lacerations were sutured, but due to his condition no surgical treatment was then deemed advisable to repair his major injuries. X-rays were taken

which disclosed a spiral comminuted fracture of the right thigh at junction of lower and middle third; also a bad comminuted fracture of the upper portion of the left thigh at the point where the hip bone enters the pelvic bones. The X-ray disclosed that the left thigh bone had broken into a number of pieces and that the shaft of the bone had been forced by or "ridden by" the other broken end and had gone into the flesh. October 5, plaintiff was awakened by pain in left chest, pulse went up to 140, 66 to 76 being normal; he spat up a little red blood. He developed a pericardial rumble over the heart which was caused by an inflammatory condition brought about by an embolus or clot of blood breaking loose and floating in the blood stream. The attending physician testified that it may have been a lung embolus which lodged near the heart. It was cleared up in fifteen days sufficiently to permit operative work. An open operation was performed on the right thigh on October 21; the fractured particles were clamped together and some particles of broken bone removed, resulting in a shortening of the limb. This resulted in a two inch difference in the length of plaintiff's legs. The other fracture was reduced without an open operation. A Kirschner wire was run through the bone above the knee and a twelve pound weight attached to apply traction to the bone. Several casts were necessary while plaintiff was in the hospital where he was confined for six months and seven days, being released on April 17th. As to the injuries sustained there is no doubt as to the shortening of one limb, for he was wearing an inch-thick sole on one shoe at the time of trial.

Dr. Farley, who had examined plaintiff in 1938 over a period of several months, summed up his condition, as appears from the abstract of record, as follows:

"I found previous impacted fracture of left hip that had resulted in limitation of movement of left hip. Complaint of pain was subjective, that is, I had to take his word for it. Found some deformity of bones. He alone

realizes pain. On June 24th and 25th examination showed limitation of ten per cent of flexion in left knee, limitation about thirty-five per cent of right knee. Some degree of over expansion of five per cent in right knee. Found about ten per cent of limitation of flexion of left hip and no limitation of movement of right hip. * * *

"I noticed two and three-eights inch shortening of one leg compared with other. Can't say what leg is normal as both were broken and both were pulled on. Both have open or closed operative reduction. No one can say either leg was normal. Patient was taken to hospital in critical condition, both legs broken, twelve or fourteen pounds pressure put on one leg and other leg opened up and reduced with appliances on bone and I think that neither leg is same as before accident. I did find one leg two and three-eights inches shorter than other. I found scar above left knee where Kirschner wire was put through as indicated in that type of fracture.

"I would say that as a result of injuries—I don't know whether his heart was damaged or not, because I don't know his condition prior to accident—at present time he does not have normal heart. Any one with normal heart is damaged rather extensively. How much you would count injury from facial scars depend on individual. In Hollywood a facial scar would be more important than out here. He has seven facial scars, a poor heart, a definite limitation of movement of right knee and left hip, shortening of one leg compared with other which has tendency to tilt entire body out of line. Only time will tell if curvature of spine or anything else will result from that. There must be compensation in pelvis for shortening of leg. Pelvis tilts 'to compensate for it. Some people with one leg shorter can walk and never show result. Others show a muscle toll in attachment of muscle to vertebra. I say all these injuries are permanent, that there may be some improvement of motion of right knee but it has been almost two years now and

that is about long enough that fixation of knee is permanent."

The testimony of plaintiff and Dr. Farley as to the heart condition sixteen months subsequent to the accident was stricken. Upon what theory, in the state of the whole record, is not clear to us, but no exception to the ruling was reserved or cross-error assigned thereon. The trial was begun June 27, 1938.

We have described plaintiff's injuries, treatment, and the resulting conditions in detail. The verdict and judgment entered thereon are large, more perhaps than we would have awarded had we been sitting as jurors; but that fact has no bearing upon the question of whether or not the amount of the verdict was excessive. Before the court may interfere with the jury in the exercise of its function as a fact-finding body in cases of this character, in the words of Chancellor Kent, hereinbefore quoted, the damages awarded must be "so outrageous as to strike everyone with the enormity and injustice of them, and so as to induce the court to believe that the jury must have acted from prejudice, partiality, or corruption." We cannot say that the judgment, under all of the circumstances of the case, is in such an amount as to require such an implication. Considering plaintiff's permanent injuries, his suffering, his age, his expectancy of nearly forty years, his lack of training for anything but manual labor, the extreme care with which employers select employees when there is a surplus of labor—a matter of general knowledge—the generally low and falling rate of return from the investment of money, and the higher cost of living as compared with periods during which similar judgments have been held to be excessive, we think the judgment here is not so large as to require us to find corruption or prejudice on the part of the jurors who assessed the damages.

The Supreme Court of Nebraska sustained a judgment for $25,000 in the case of *Thomas v. Otis Elevator Co.*,

103 Neb. 401, 172 N.W. 53. Concerning the injuries of the plaintiff in that case, the court said:

"The fall caused compound fracture of both legs, broke one arm, fractured his jaw, dislocated a number of his teeth, and otherwise severely sprained, bruised and injured him. His injuries required a number of surgical operations, which resulted in shortening one leg about one and a half inches more than the other one which was also shortened. He suffered severe pain and agony, his knee was stiffened, and he is a cripple for life. He was a young man about 26 years of age, at that time, of strong physique, and was earning at the time of the accident from $85 to $90 and upwards a month, excluding overtime, and his expectancy of life was 37.14 years."

The Court of Appeals of Illinois in *Kavale v. Morton Salt Co.*, 242 Ill. App. 205 (affirmed by the Supreme Court of that state in 329 Ill. 445, 160 N.E. 752) upheld a verdict for $31,000. The following appears in the opinion:

"The defendant further contends that the judgment is excessive and should be reversed for that reason. The record discloses that plaintiff was a carpenter by trade, 45 years of age and was earning about $65 per week at the time he was injured. He was knocked down by the truck and when the truck stopped defendant's arm was caught in the drive chain so that he could not be extricated. The police who arrived almost immediately after the accident endeavored to cut the chain, but were unable to do so. The fire department was then called and with the use of an acetylene torch they melted a link in the chain and plaintiff's arm was then released. He was taken to the hospital and it was found upon examination that plaintiff had suffered a compound fracture of the fourth metacarpal bone of the left hand, a compound fracture of both bones of the left forearm and a compound fracture of both bones of the left leg. The surgeon testified that when plaintiff was brought into

the hospital the fractured ends of the leg were protruding through the flesh; that the leg was bent at a right angle and it was a question whether the leg would have to be amputated. The leg was then placed in a fracture box for a long time and dressed. The arm was operated on in about a week or ten days. It was necessary to use a steel plate to hold it in place. The injured leg could not be dressed for some time afterwards on account of dirt being ground into the flesh. After the fracture of the leg was reduced, pieces of bone came out from time to time. The defendant was confined to the hospital for about a year and he was able to return to work about 18 months after the accident. The surgeon testified on the trial that in his opinion if plaintiff worked at his trade as a carpenter and was required to climb ladders, the leg would be disabled at least 50 per cent.

"It is obvious that plaintiff suffered very greatly; that his injuries are permanent and he testified that he still felt the effects of his wounds. In *Posch v. Chicago Rys. Co.*, 221 Ill. App. 241; and *Lagatutte v. Chicago Daily News*, 239 Ill. App. 675, we said that we could not be unmindful of the fact that the money value of life and health is appreciating and the purchasing power of money depreciating during recent years. In the latter case we affirmed a judgment of $35,000, where a boy was so injured as to require his leg to be amputated below the knee. In view of all the evidence in the record, we are of the opinion that the judgment is not of such an amount that would warrant interference on our part."

In *Dieffenbach v. New York, L. E. & W. R. Co.*, 38 N.Y.S. 788, the plaintiff, with injuries apparently no more serious than those occurring in the present case but who had a larger earning capacity, recovered a judgment in the sum of $25,000, which was fixed by the trial court after the jury had returned a verdict for $35,000. The judgment was upheld by the appellate court which remarked, "We do not think, upon the case presented

here, that the verdict, as reduced, was at all excessive."

In *Lynch v. American Linseed Co.*, 107 N.Y.S. 458, affirmed by appellate court in 194 N.Y. 574, 88 N.E. 1124, a judgment for $20,000 for serious leg injuries was sustained. Two juries had previously tried the cause, one awarding $10,000 and the other $5,000 for the injuries.

In *Kampf v. Mak Fruit & Vegetable Markets, Inc.*, 243 App. Div. 575, 276 N.Y.S. 171, it is held that a verdict for plaintiff (amount not given) struck by a truck which crushed his left leg was excessive in so far as it exceeded $45,000.

The Supreme Court of Oklahoma in *Bucktrot v. Partridge*, 130 Okla. 122, 265 Pac. 768, sustained a verdict of $25,500 actual and $5,000 exemplary damages in favor of a seventeen year old girl whose hip was fractured resulting in a shortening of one leg and a reduction in the pelvic cavity which physicians said would interfere with childbirth, if it did not make it impossible.

A large number of cases relating to verdicts allegedly excessive, some held to be so and others not, are collated in Parmele on Damage Verdicts, beginning at page 2040. See, also, 46 A.L.R. 1230, and 102 A.L.R. 1125. An attempt to harmonize all the cases would be futile.

Judgment affirmed.

MR. JUSTICE KNOUS and MR. JUSTICE BURKE concur.

MR. CHIEF JUSTICE FRANCIS E. BOUCK concurs in the conclusion.