**VAN WATERS & ROGERS, INC., Petitioner,**

v.

**Patrick K. KEELAN and Bonnie Keelan, Respondents.**

**No. 91SC549.**

Supreme Court of Colorado, En Banc.

Nov. 23, 1992.

Parcel Mauro Hultin & Spaanstra, P.C., Edward W. Stern, James L. Harrison, Denver, for petitioner.

Feder, Morris, Tamblyn & Goldstein, P.C., Leonard M. Goldstein, Stephen B. Schuyler, Denver, for respondents.

McDermott, Hansen, Anderson & Reilly, William J. Hansen, Denver, for amicus curiae Colorado Trial Lawyers' Ass'n.

Justice LOHR delivered the Opinion of the Court.

This case arises from an accident in which plaintiff Patrick K. Keelan [1] was injured when he was struck by a pallet jack that rolled off the back of a delivery truck. Patrick and Bonnie Keelan brought a negligence action in Denver District Court against Van Waters & Rogers, Inc. (Van Waters), the company that owned the jack. Van Waters conceded liability at trial, and the jury subsequently returned a verdict awarding Patrick Keelan $411,000 and Bonnie Keelan $10,000 in damages. Van Waters opposed the entry of judgment, contending that under section 13–21–111.6, 6A C.R.S. (1987), the verdict should be reduced by the amount that Patrick Keelan would receive in disability benefits pursuant to the State Fire and Police Pension Plan as set out in section 31–30–1007, 12B C.R.S. (1986 & 1992 Supp.).

The trial court rejected Van Waters' argument and entered a final judgment for $463,284.90, including costs and interest. The Colorado Court of Appeals affirmed the entry of judgment after it determined that Keelan's disability benefits resulted from a contract that was "entered into and paid for" by both Keelan and the State of Colorado on Keelan's behalf and, thus, were exempt from the setoff requirement in section 13–21–111.6. *Keelan v. Van*

---

**1.** The Denver District Court records are clear that the middle initial of Patrick Keelan is "K." The notice of appeal first erroneously showed the middle initial as "A," and that error has been perpetuated in other documents, including the briefs filed in this court.

*Waters & Rogers, Inc.,* 820 P.2d 1145 (Colo.App.1991). We granted certiorari to review the court of appeals' interpretation and application of section 13–21–111.6 and now affirm its judgment denying a setoff against the jury's verdict.

## I

Since 1976, Patrick Keelan had worked as a firefighter for the City of Denver. He and his wife had also owned and operated a swimming pool maintenance business, part of which included ordering and supervising the delivery of swimming pool chemicals. Defendant Van Waters is a distributor of swimming pool chemicals. On April 30, 1987, a Van Waters employee delivered chemical supplies to a swimming pool construction site that Keelan was monitoring. As the supplies were being unloaded, a pallet jack weighing approximately 1,200 pounds rolled off the back of the delivery truck and struck Keelan on the head, shoulder, and foot. As a result of his injuries, Keelan was declared occupationally disabled by the Fire and Police Pension Association (FPPA) and began receiving disability payments from a pension fund that the State of Colorado had established for police officers and firefighters. *See* §§ 31–30–1001 to –1019, 12B C.R.S. (1986 & 1992 Supp.).

In April 1989, the Keelans instituted a negligence action against Van Waters[2] in which Patrick Keelan sought damages for medical and therapy expenses, pain and suffering, and loss of his firefighter and swimming pool maintenance careers, and Bonnie Keelan sought damages for loss of consortium. Van Waters conceded its liability at trial and the jury returned a verdict awarding Patrick Keelan $411,000 and Bonnie Keelan $10,000 on their claims against Van Waters. Under section 13–21–111.6, 6A C.R.S. (1987), Van Waters moved that the trial court offset this award by $335,255.81, the then present value of Keelan's disability benefits. The trial court denied the motion after it determined that the disability payments resulted from a contract that was "entered into and paid for" by both Keelan and by the State's pension fund on Keelan's behalf and that they were therefore exempt from the setoff requirement of section 13–21–111.6. Consequently, the court entered judgment for the Keelans in the total amount of $463,284.90, including costs and interest.

The court of appeals agreed that Keelan's benefits were within the express exception to the setoff requirement of section 13–21–111.6 and therefore affirmed the trial court's judgment. *Van Waters,* 820 P.2d at 1149. The court of appeals specifically determined that Keelan had an employment contract with the City of Denver and that the disability benefits arose from this contract. *Id.* at 1148. Since it further determined that the benefit was paid for by Keelan, in that he gave consideration in the form of services to the fire department, the court concluded that the setoff under section 13–21–111.6 was correctly denied. *Id.* at 1149.

Van Waters seeks reversal of that decision, contending that the court of appeals misinterpreted section 13–21–111.6 and erred in holding that Keelan's disability benefits were exempt from the statute's setoff requirement. We disagree with Van Waters' argument. We hold that the court of appeals properly construed and applied section 13–21–111.6, and therefore affirm its judgment.

## II

A critical factor in determining the impact of section 13–21–111.6 on the jury's award is the nature of the pension plan from which Keelan's disability benefits derive. We therefore review those aspects of the State's pension system that are relevant to our decision.

At the time Keelan began working with the Denver Fire Department in 1976, the firefighter pension system was governed

---

2. The Keelans also named Juan A. Dominguez, Sr., the Van Waters employee who drove the delivery truck, as a defendant. They later moved to dismiss the complaint against Domin- guez. The record on appeal does not contain any ruling on this motion, but the court's original order of judgment notes that Dominguez was earlier "dismissed from the case."

by sections 31–30–501 to –523, 12B C.R.S. (1986 & 1992 Supp.). Under these statutes, a local "firemen's pension fund" was established in each city that had a paid fire department and a population of over one hundred thousand people. § 31–30–501. This pension system provided for both regular retirement and disability retirement benefits, §§ 31–30–508; –511, and was funded by several sources, including assessments that were deducted from the salaries of fire department employees. §§ 31–30–503; –504.

In 1979, the Colorado General Assembly created a new pension system called the State Fire and Police Pension Plan (the Plan). Ch. 316, sec. 1, §§ 31–30–1001 to – 1016, 1979 Colo.Sess.Laws 1189–1203. This was a legislative response to a concern that the previous system was actuarially unsound and in need of additional funding to cover accrued liabilities and ongoing service costs. *See Peterson v. Fire & Police Pension Ass'n,* 759 P.2d 720, 722–23 (Colo. 1988), and *City of Colorado Springs v. State,* 626 P.2d 1122, 1124–25 (Colo.1981), for a review of the statutory history and financial studies leading up to this legislation. The Plan was designed to cover, with limited exceptions, all full-time police officers and firefighters in the state of Colorado who were hired after April 7, 1978. § 31–30–1003(6). Employers had the option of electing affiliation with the new plan. § 31–30–1003(3)(a). In the event that an employer made such an election, the assets of the former local pension system were transferred to the Plan's state-wide fund. § 31–30–1003(3)(c). Thereafter, any benefits due to an employee under the former system became payable by the FPPA. *Id.* Employees who were hired before April 7, 1978, and who worked for an affiliating employer could continue with their existing coverage or could switch to the Plan's coverage. § 31–30–1003(3)(b). If they chose to switch, however, they waived their rights to receive benefits from their local system.[3] *Id.*

The Plan is administered by the FPPA's nine-member governing board, which is appointed by the governor and confirmed by the senate. § 31–30–1004(2). The Plan provides normal retirement benefits for members who satisfy specific age and service requirements, disability benefits for those who are unable to work because of disabilities, and survivor benefits for spouses and dependent children of deceased members. §§ 31–30–1006 to –08. Funding for these benefits, which comes from various sources including employer contributions, member contributions, moneys from fire and police benefit plans, and State contributions, is distributed into various accounts of a statewide fund. § 31–30–1012(1). Pursuant to section 31–30–1013, members contribute a percentage of their salaries to the Fund's retirement account. Pursuant to section 31–30–1014, the State makes annual contributions that are deposited into an account to fund death and disability benefits.[4] These contributions

---

**3.** Keelan was considered an "old hire" in that he began working for the City before April 8, 1978, and, thus, was covered by the local pension system. *See* § 31–30–1003(3)(b). Since the Denver Fire Department chose to affiliate with the Plan, however, the assets from the local system were transferred to the statewide fund. Furthermore, since Keelan elected coverage under the Plan, he gave up his right to receive benefits from the local system and is therefore governed by the Plan's provisions. Keelan now urges us to find that by virtue of earlier contributions that he made under the local system, he directly paid for the disability benefits that he now receives from the State fund. Because he did not present this argument to either the trial court or the court of appeals, we decline to consider it on review. *See Dove v. Delgado,* 808 P.2d 1270, 1273 n. 3 (Colo.1991) ("[g]enerally, issues not presented in the trial court are

deemed waived and cannot be raised on appeal"). Furthermore, since we find that Keelan satisfied the payment requirement under § 13–21–111.6 by giving consideration, in the form of employment services, in return for the right to receive disability benefits, resolution of whether Keelan also made sufficient personal contributions to satisfy the statute is not necessary for this decision.

**4.** Keelan conceded that the death and disability benefits are funded solely by the State and that he made no direct contributions to this account. While the record discloses that member contributions do make up a small proportion of the death and disability account, in light of Keelan's concession and the fact that we construe the payment requirement contained in § 13–21–111.6 to be satisfied by his service to the fire

are presently scheduled to cease in 1996, § 31–30–1014(2)(c), 12B C.R.S. (1992 Supp.), at which time the death and disability benefits are to be funded through local revenue sources.

## III

Section 13–21–111.6, 6A C.R.S. (1987), provides that a plaintiff's damage award shall be reduced by amounts by which the plaintiff is compensated for a loss from a collateral source. Central to this case is the one exception to this general rule contained in the second clause of the statute. Section 13–21–111.6 states:

> In any action by any person ... to recover damages for a tort resulting in death or injury to person or property, the court, after the finder of fact has returned its verdict stating the amount of damages to be awarded, shall reduce the amount of the verdict by the amount by which such person ... has been or will be wholly or partially indemnified or compensated for his loss by any other person, corporation, insurance company, or fund in relation to the injury, damage, or death sustained; *except that the verdict shall not be reduced by the amount by which such person ... has been or will be wholly or partially indemnified or compensated by a benefit paid as a result of a contract entered into and paid for by or on behalf of such person.* The court shall enter judgment on such reduced amount.

§ 13–21–111.6, 6A C.R.S. (1986) (emphasis added).

This statute was enacted in 1986. Ch. 107, sec. 3, § 13–21–111.6, 1986 Colo.Sess. Laws 677, 679. Prior to that time, the common law did not require setoffs against damage awards. Rather, plaintiffs were allowed to recover the full damages awarded against defendants even though the plaintiffs also received compensation from collateral sources. This principle of double recovery, known as the collateral source rule, provided that "compensation or indemnity received by an injured party from a collateral source, wholly independent of

the wrongdoer and to which he has not contributed, will not diminish the damages otherwise recoverable from the wrongdoer." *Kistler v. Halsey*, 173 Colo. 540, 545, 481 P.2d 722, 724 (1971). The collateral source rule was not applicable in situations in which a plaintiff's compensation was attributable to the defendant. *See Carr v. Boyd*, 123 Colo. 350, 356–57, 229 P.2d 659, 663 (1951) ("Benefits received by the plaintiff from a source other than the defendant and to which he has not contributed are not to be considered in assessing the damages.") (quoting 15 Am.Jur. *Damages* § 201 (1938)); *see also Steckler v. United States*, 549 F.2d 1372, 1379 (10th Cir.1977) (In an action against the United States under the Federal Tort Claims Act, that portion of plaintiff's Social Security benefits that were funded by federal government contributions were not collateral sources and, thus, were subject to setoff.). Nor did the collateral source rule apply to compensation "gratuitously furnished" to a plaintiff by a governmental body. *Englewood v. Bryant*, 100 Colo. 552, 554, 68 P.2d 913, 914–15 (1937) (medical expenses gratuitously paid by county or state are not properly allowable in suit against city). Subject to those limited exceptions, courts would not reduce a judgment because the plaintiff had received compensation from a collateral source even if the result was that the plaintiff recovered twice for a single loss.

The purpose of the collateral source rule was to prevent the defendant from receiving credit for such compensation and thereby reduce the amount payable as damages to the injured party. To the extent that either party received a windfall, it was considered more just that the benefit be realized by the plaintiff in the form of double recovery rather than by the tortfeasor in the form of reduced liability. *See Publix Cab Co. v. Colorado Nat'l Bank of Denver*, 139 Colo. 205, 229, 338 P.2d 702, 715 (1959) ("principle that one who carries health and hospital insurance nevertheless has a right to recover these amounts from the wrongdoer ... is based upon the rea-

department, we need not consider these contributions in resolving this dispute.

soning that such a policy is made between the insured and the insuror and does not mitigate the damages of the tort feasor"); *Riss & Co. v. Anderson,* 108 Colo. 78, 84, 114 P.2d 278, 281 (1941) ("a tortfeasor may not plead his victim's prudence and foresight [in purchasing insurance] to relieve him from the consequences of his own wrong"); *Restatement (Second) of Torts* § 920A, cmt. b (1979) ("[I]t is the position of the law that a benefit that is directed to the injured party should not be shifted so as to become a windfall for the tortfeasor. If the plaintiff was himself responsible for the benefit, as by maintaining his own insurance or by making advantageous employment arrangements, the law allows him to keep it for himself. If the benefit was a gift to the plaintiff from a third party or established for him by law, he should not be deprived of the advantage that it confers.").

It is clear that the common law collateral source rule applied to a plaintiff's purchase of private insurance and that the amounts received as proceeds under such insurance contracts were not required to be set off against damages for which a tortfeasor was obligated. *See, e.g., Rhinehart v. Denver and Rio Grande R.R. Co.,* 61 Colo. 369, 373–80, 158 P. 149, 151–53 (1916) (award against railroad for damages resulting from fire caused by railroad not to be set off by amounts recovered from fire insurance). Furthermore, the rule has extended beyond the insurance contract context and has protected other types of benefits that are analogous to insurance proceeds, including those that an employed plaintiff receives by virtue of such employment. *See, e.g., Franklin v. Templeton,* 163 Colo. 48, 51, 428 P.2d 361, 363 (1967) (the benefits of "sick leave or vacation time as the result of [an] accident ... cannot be used to the advantage of the defendants [who were not the plaintiff's employers] for such time lost is compensable as damages"); *Moyer v. Merrick,* 155 Colo. 73, 77, 80, 392 P.2d 653, 655, 657 (1964) (since money received from a pension plan to which an employee had contributed by way of salary reductions was within the collateral source rule, evidence of receipt by plaintiff of pension benefits in an action for damages resulting from the defendant's negligence was inadmissible); *Carr,* 123 Colo. at 356–59, 229 P.2d at 662–64 (evidence of disability benefits conferred under the Railroad Unemployment Insurance Act inadmissible in negligence action on issue of damages); *see also Publix Cab Co.,* 139 Colo. at 229, 338 P.2d at 715 (sick benefits and other aids received from benefit societies, fraternal societies, and other organizations of that class are of the same character as insurance money proper).

This brings us to the question of the effect of section 13–21–111.6 on the common law collateral source rule. Van Waters contends that when the legislature enacted the statute it narrowed the rule so as to limit the instances of double recovery to those in which the plaintiff's additional compensation results from a privately obtained insurance contract. It argues that the court of appeals erred when it exempted Keelan's disability benefits from the statute's setoff requirement. According to Van Waters, since the court of appeals' rationale would preclude the setoff of virtually any benefit for which a plaintiff gives some sort of consideration, the court incorrectly codified the common law rule in contravention of the legislature's purpose of denying double recovery.

■ We agree with Van Waters to the extent that it argues that the underlying purpose of section 13–21–111.6 is to limit the circumstances under which a plaintiff can receive double compensation for an injury. It is clear, however, that in placing an exception within the statute, the General Assembly intended to preclude the setoff of certain types of benefits. Based on our review of the language and legislative history of the statute, we believe that the disability payments that Keelan received qualify for application of the statutory exception. Specifically, because we conclude that the payments resulted from a contract that was "entered into and paid for" by Keelan, we affirm the court of appeals' denial of a setoff.

Familiar principles guide us in discerning the meaning of section 13–21–111.6. A court's primary task in construing a statute is to ascertain and give effect to the intent of the General Assembly. *Woodsmall v. Regional Transp. Dist.*, 800 P.2d 63, 67 (Colo.1990); *Kane v. Town of Estes Park*, 786 P.2d 412, 415 (Colo.1990). To determine that intent we look first to the statutory language. *Woodsmall*, 800 P.2d at 67; *Kane*, 786 P.2d at 415. When the language is clear and unambiguous, there is no need to resort to interpretative rules of statutory construction and the statute must be applied as written. *Jones v. Cox*, 828 P.2d 218, 221 (Colo.1992); *Griffin v. S.W. Devanney & Co.*, 775 P.2d 555, 559 (Colo.1989). If, however, the language is ambiguous or uncertain as to its intended scope, with the result that the text lends itself to alternative constructions, a court may look to "[t]he object sought to be attained" by the legislature, "[t]he circumstances under which the statute was enacted" and "[t]he legislative history" of the statute. § 2–4–203(1)(a)–(c), 1B C.R.S. (1980); *see also Griffin*, 775 P.2d at 559; *Charnes v. Boom*, 766 P.2d 665, 667 (Colo. 1988). Finally, statutes in derogation of the common law must be strictly construed, so that if the legislature wishes to abrogate rights that would otherwise be available under the common law, it must manifest its intent either expressly or by clear implication. *See Farmers Group, Inc. v. Williams*, 805 P.2d 419, 423–24 (Colo.1991) (requiring "clear legislative intent" to recognize abrogation of a common law tort claim for bad faith breach of insurance contract); *Collard v. Hohnstein*, 64 Colo. 478, 479, 174 P. 596, 596 (1918) (before plaintiff will be deprived of a common law right of action, it must "affirmatively appear that the statutes themselves, either directly or by necessary implication, abrogate such right").

The first clause of section 13–21–111.6 mandates that a court *"shall* reduce the amount of [a] verdict" by the amount that a plaintiff is "compensated for his loss by *any* other person, corporation, insurance company, or *fund* in relation to the injury ... sustained" (emphasis added). Even after giving full effect to the rule of strict construction applicable to statutes in derogation of the common law, we must conclude that the language of this clause evinces a clear intent by the General Assembly to change the common law rule and require damages to be set off by collateral source contributions not specifically excepted by the second clause of the statute. *See Pigford v. People*, 197 Colo. 358, 360, 593 P.2d 354, 356 (1979) (while "[l]egislative acts in derogation of the common law will be strictly construed ... legislative intent which is clearly expressed must be given effect"). Thus, since Keelan's disability compensation was paid out of a fund created for the fire and police members' benefit, § 31–30–1012(1)(b), the general requirement of the collateral source statute mandates that the verdict be reduced by the amounts he received, unless the payments qualify for the statutory exception.

We must determine, therefore, whether Keelan's compensation qualified for the statute's exception, which excludes from the general setoff requirement benefits that are "paid as a result of a contract entered into and paid for by or on behalf of [the plaintiff]." § 13–21–111.6. In construing the scope of this exception, the court of appeals found the legislative intent clear on the face of the statute and based its decision on the language alone without addressing either the context of the statute in the framework of Colorado's tort law or the legislative history surrounding its enactment. *Van Waters*, 820 P.2d at 1147. In *U.S. Fidelity & Guar. Co. v. Salida Gas Serv. Co.*, 793 P.2d 602, 604 (Colo.App. 1989), however, a different panel of the court of appeals did rely in part on the legislative history in interpreting the statute and in holding that contributions by non-tortfeasors fell within the setoff requirement.[5] We conclude that the scope of

---

**5.** In *U.S. Fidelity & Guar. Co.*, the plaintiff, who had filed a negligence action based on a propane gas explosion, accepted an offer of judgment from one of the defendants, and the jury subsequently found such defendant not to have been negligent. The court of appeals held that

section 13–21–111.6 is not entirely clear and that we must therefore look beyond its plain language to determine the construction most in accordance with the legislature's intent. More specifically, we must address whether Keelan's employment contract with the City of Denver, which both the trial court and the court of appeals relied upon as a basis for finding that the moneys received by Keelan from the pension fund fell within the exception clause, is the type of contract contemplated by the statute and, further, whether his disability benefits were paid as a result of this contract.

The context within which the legislature enacted the statute is instructive in ascertaining the statute's intended scope and in determining whether the exception clause covers Keelan's employment contract. The General Assembly enacted section 13–21–111.6 as part of a sweeping array of tort reform legislation designed to limit the amounts that plaintiffs can recover in civil actions. For example, in the same year that it enacted the collateral source statute, the legislature amended an existing statute to limit exemplary damage recoveries. Ch. 106, sec. 1, § 13–21–102, 1986 Colo.Sess. Laws 675, 675–76. *See Lira v. Davis*, 832 P.2d 240, 245–46 (Colo.1992) (recognizing that "as part of the sweeping tort-reform legislation of 1986," the legislature's purpose in amending section 13–21–102 "was to limit excessive punitive damages awards"). It also limited the liability of persons who voluntarily provide service or assistance to others, ch. 110, sec. 1, § 13–21–116, 1986 Colo.Sess.Laws 685, 685–86, increased protections against civil actions for mental health care providers, ch. 111, sec. 1, § 13–21–117, 1986 Colo.Sess.Laws 687, 687–88, and limited product liability actions for injuries caused by the discharge of firearms and ammunition to those based on allegations of design or manufacture defects, ch. 112, sec. 1, § 13–21–501 to – 505, 1986 Colo.Sess.Laws 689–90. Furthermore, in Senate Bill 67, in which section 13–21–111.6 is contained, the legislature placed monetary limits on damages for noneco-

nomic losses and required that assumption of the risk be considered in apportioning negligence between parties. Ch. 107, sec. 1, §§ 13–21–102.5, 13–21–111.7, 1986 Colo. Sess.Laws, 677, 677–79. Viewed within the context of this legislation, in which the General Assembly took various steps to limit damages awards, it is evident that section 13–21–111.6 was designed as an additional restriction on recoveries. *See Walgreen Co. v. Charnes*, 819 P.2d 1039, 1043 n. 6 (Colo.1991) (pursuant to statutory construction rule of *in pari materia*, "statutes relating to the same subject matter [are to be] construed together in order to gather the legislature's intent from the whole of the enactments") (citing *Black's Law Dictionary* 791 (6th ed. 1990)).

The legislative history of section 13–21–111.6 provides further support for such an interpretation. In *United States Fidelity & Guar.*, 793 P.2d at 604, the court of appeals examined the General Assembly's discussions surrounding the statute's enactment:

> As Senator Hefley noted during consideration of the proposed § 13–21–111.6, its purpose is to prevent double recovery by the injured party. Thus, he stated, money obtained from a collateral source should be offset because the injured party has been made partially whole.

*Id.* (citing Tape Recording of Testimony before Senate Business and Labor Committee on Senate Bill 67, February 18, 1986, 55th General Assembly). The legislative history of section 13–21–111.6, however, also reflects a countervailing concern that a tortfeasor should not receive the benefit of an offset from payments received by the injured party or that party's heirs from sources such as retirement benefits, disability benefits and life insurance. Before proposed section 13–21–111.6 was amended to add the exception clause that we now must construe, the following discussion took place in legislative committee between senators Meiklejohn and Hefley:

---

§ 13–21–111.6 required that the payment made pursuant to the offer of judgment be set off

against the judgment obtained against the other defendant.

Senator Meiklejohn: There's something unfair about me getting killed and my wife suing somebody and collecting, my insurance pays off and that goes as a credit against the judgment. There's something unfair about that. And that's what that section would do if it were the law.

. . . .

I don't think a person ought to collect more than once, you know, for the hospitalization costs and things like that. The question really is who should pay that, you know, if my insurance company pays my hospitalization as a result of an accident, shouldn't they be allowed to collect from the tortfeasor to get their money back. That's the way I think it ought to really be. I agree that the injured party should collect once on those economic losses like that, but the retirement benefits, life insurance, perhaps other things that I just think it's an injustice to say that that would apply against the damages in a lawsuit. I haven't really worked out that language.

. . . .

Senator Hefley: OK, let's see what you've listed here—individually held disability and life insurance, social security benefits, death benefits, and maybe some unemployment benefits. Do you want to make that in the form of a motion, Senator Meiklejohn, and I'm sure by the time this gets to the floor, if we have other things that need to be added, someone will tell us.

Senator Meiklejohn: Well, I'll leave that up to the staff to write it but if [sic] those things that you're paying for one way or the other that I don't think ought to be deducted from a judgment.

Tape recording of testimony before the Senate Business and Labor Committee on Senate Bill 67, February 18 and 19, 1986, 55th General Assembly. Following this exchange, the proposed statute was amended to add the exception clause.

This history confirms that the general goal of section 13–21–111.6 was to limit double recoveries. It also shows, however, an intent not to deny a plaintiff compensa-

tion to which he is entitled by virtue of a contract that either he, or someone on his behalf, entered into and paid for with the expectation of receiving the consequent benefits at some point in the future. Because Keelan received his disability payments as a result of entering into an employment contract with the City of Denver and giving his services in exchange for a compensation package that included the right to recover pension benefits, we conclude that his employment contract is the type of contract contemplated by the drafters of the statutory exception.

■ The trial court determined that Keelan entered into an employment contract with the City of Denver and that he gave consideration in the form of service to the fire department for that contract. Van Waters argues, however, that such an employment contract does not qualify for the setoff exception because it is not one that was "entered into and paid for" either by or on behalf of Keelan. According to Van Waters, the statute excludes from setoff only those benefits that result from privately obtained insurance contracts for which a person pays some monetary premium. Consequently, since Keelan's disability payments resulted from a legislative appropriation rather than from a contract for which either Keelan or someone on his behalf paid money, Van Waters contends that his benefits are not entitled to protection against setoff. We reject such a narrow interpretation of the statute and hold that the exception clause is broad enough to protect benefits that result from an employment contract for which a person gives consideration in the form of services and that the protection provided by the exception clause is not limited to proceeds from private insurance contracts.

■ As Van Waters acknowledges, the exception clause clearly denies the setoff of benefits that result from private insurance contracts for which someone pays monetary premiums. In that situation the concern of double recovery for a loss is lessened by the fact that the benefits were previously paid for by the person or by someone else on the person's behalf. The

legislative discussions, however, evince an intent that other types of benefits, such as "individually held disability and life insurance, social security benefits, death benefits, and maybe some unemployment benefits" also be excluded. *See* statement by Senator Hefley, *supra.* Furthermore, Senator Meiklejohn's statement that "things that you're paying for *one way or the other* ... ought [not] be deducted from a judgment," *supra* (emphasis added), reflects the view that the benefit need not be paid for monetarily to come within the exception. We therefore construe the clause as broad enough to cover contracts for which a plaintiff gives some form of consideration, whether it be in the form of money or employment services, with the expectation of receiving future benefits in the event they become payable under the contract.

We are satisfied that our construction of the statute comports with the statutory language and is consistent with the available expressions of legislative intent. In addition, it serves the purpose of protecting benefits to which a person is entitled by virtue of that person's own efforts. Because an employee exchanges something of value, his services, in return for an employment contract and its derivative benefits, benefit payments received as part of the compensation for these services are entitled to the same protection against offset that would apply to benefits received as a result of an insurance contract for which that person had paid money. *See Riss & Co.,* 108 Colo. at 84, 114 P.2d at 281 (if a benefit plan is part of an employee's compensation, "then [the employee] bought and paid for such insurance as clearly as though he had purchased an accident policy").[6] Thus, even though Keelan provided services in exchange for his employment contract and paid no money for the employee benefits, we conclude that his right to receive the ensuing disability benefits was within the statute's exception clause.

The trial court also found that Keelan's disability benefits were paid "as a result of" his employment contract with the City. Even though the State provided the funding, the court determined that the benefit recipients had negotiated for the Plan and considered it a part of their contract with the City.[7] The right to receive pension benefits is contractual in nature and arises out of the employer-employee relationship. This is true in systems where an employee pays for the benefit by way of salary deductions, *Police Pension and Relief Bd. v. McPhail,* 139 Colo. 330, 338 P.2d 694 (1959), as well as in those systems that are

---

**6.** In *Mays v. United States,* 806 F.2d 976, 977–78 (10th Cir.1986), *cert. denied,* 482 U.S. 913, 107 S.Ct. 3184, 96 L.Ed.2d 673 (1987), the court rejected the argument that a veteran's military service established a contribution to the CHAMPUS program (Civilian Health and Medical Program of the Uniformed Services) and therefore held that payments out of that program were not from a collateral source independent of the wrongdoer. *Mays,* however, was a case brought against the United States under the Federal Tort Claims Act. Since funding for the CHAMPUS program was "furnished by the Congress through the annual Appropriations Act," *id.* at 977, the benefits were derived from direct contributions made by the defendant itself and, thus, were not from a collateral source. Such is not the case in the present action where it is clear that Van Waters made no contributions to the fund from which Keelan received his disability payments. To the extent, however, that *Mays* held that a veteran's military service cannot be considered as a basis for finding contributions to the CHAMPUS program, we reject that court's reasoning and hold that a plaintiff's employment service can provide sufficient payment for a contract to trigger the statutory exception to the setoff requirement of § 13–21–111.6 for benefits paid as a result of that contract.

**7.** To support these findings, the trial court pointed to an affidavit by an attorney who had been involved in the establishment of the FPPA and the Plan which showed that the legislature's appropriation was intended to assist the City in satisfying its contractual obligation to provide disability benefits to firefighters and that "[t]his disability benefit is a term of the employment contract which exists between a fire fighter and the city." In light of this evidence, to which the incomplete record designated on appeal reflects no objection by Van Waters, we find no reason to disturb the trial court's findings on review. *See Gebhardt v. Gebhardt,* 198 Colo. 28, 30, 595 P.2d 1048, 1050 (1979) ("It is axiomatic that an appellate court cannot substitute itself as a finder of fact, and that the factual findings of the lower court sitting without a jury are not to be disturbed upon appeal unless clearly erroneous and not supported by the record.").

funded by legislative appropriations, *In re Marriage of Gallo*, 752 P.2d 47, 48, 51 (Colo.1988) (in the context of a system where an employee's retirement benefits were funded by congressional appropriations, we stated that "[s]ince pension benefits represent a form of deferred compensation for services rendered, the employee's right to such benefits is a contractual right, derived from the terms of the employment contract"). *See also Colorado Springs Fire Fighters Ass'n v. City of Colorado Springs*, 784 P.2d 766, 770 (Colo. 1989) ("Rights which accrue under a pension plan are contractual obligations which are protected under article II, section 11, of the Colorado Constitution and article I, section 10, of the United States Constitution.... [P]ension plans promote important public policy considerations because they are structured 'to reward efficiency, to encourage officers to remain in the service, and to give assurance of a decent living upon retirement....' ") (quoting *Kirschwing v. O'Donnell*, 120 Colo. 125, 129, 207 P.2d 819, 821 (1949)); *Peterson v. Fire and Police Pension Ass'n*, 759 P.2d 720, 725 (Colo.1988) (recognizing that prior to the death of a police officer or firefighter, there is limited vesting of survivor benefits under the plan). Thus, regardless of the fact that Denver was not the source of the disability funding, we hold that Keelan had a contractual right to receive these benefits and that they "arose from his contract with Denver." *Van Waters*, 820 P.2d at 1148.

The foregoing analysis and conclusions make it unnecessary to determine whether, as the court of appeals held, the benefits were also paid for by the State on Keelan's behalf and thereby satisfied the requirement that the benefits derive from a "contract entered into and paid for by or on behalf of [him]." *See id.* at 1149.

The court of appeals correctly determined that the disability benefits that Keelan received pursuant to the firefighters' pension system were not subject to the general setoff requirement contained in section 13–21–111.6. We agree with the court of appeals' reasoning that by virtue of his services to the fire department, Kee-

lan entered into and paid for an employment contract with the City of Denver. Moreover, since the benefits that Keelan received were paid as a result of this contract, we are satisfied that they are within the scope of the statute's exception to the setoff requirement and we therefore affirm the judgment of the court of appeals.

ROVIRA, C.J., specially concurs.

Chief Justice ROVIRA specially concurring:

I agree with the majority opinion to the extent that it holds that the statutory exception contained in section 13–21–111.6, 6A C.R.S. (1986), applies to the facts of this case. Keelan entered into an employment contract that, in addition to a salary, contained fringe benefits that included a provision for disability pension payments. These fringe benefits were presumably not gratuitous, and it is self-evident that in exchange for these benefits Keelan received less salary than he would have received absent these benefits. *See Police Board v. Bills*, 148 Colo. 383, 388, 366 P.2d 581, 583 (1961) (pension plans are material inducements to the employee to remain in the employ of government); 3 M. Minzer, *Damages in Tort Actions* § 17.31[1] at 17–192 (payments to injured employees under retirement and disability pension programs may accurately be characterized as "bargained-for fringe benefits integrally incorporated into the employment contract"). Essentially, Keelan "paid" for these benefits by rendering his services for a lower salary; and he, rather than Van Waters, is entitled to the result of his own prudence.

I write separately to emphasize that the majority's construction of section 13–21–111.6 will not ordinarily result in a windfall recovery for plaintiffs. Generally, an insurance policy will provide for subrogation or refund of benefits upon a tort recovery. Thus, the plaintiff will receive no double recovery. *See 3 Damages in Tort Actions* § 17.21[2] at 17–75 to –76 (subrogation serves to assure ultimate payment of a debt by a party which in equity and good conscience should assume liability for it);

*Western Cas. & Sur. Co. v. Bowling,* 39 Colo.App. 357, 565 P.2d 970 (1977). Such an approach is consistent with the legislative intent underlying section 13–21–111.6, *see* Comments of Senator Meiklejohn, maj. op. at 1077–78 (insurance company that pays hospitalization should be allowed to "collect from the tortfeasor to get their money back," and the injured party should collect only once on those economic damages), and addresses three main policy concerns: (1) plaintiffs will be compensated for their injury; (2) insurance companies will be reimbursed for their expenditures on plaintiffs' behalf, minimizing the societal cost of insurance; and (3) tortfeasors will bear the full economic cost of their actions.

However, there properly may be a line drawn between insurance, for which there is subrogation or refund of benefits provisions, and benefits represented by life insurance, retirement benefits, and disability pensions, for which there is no subrogation. These types of benefits may be regarded as "the proceeds of an investment rather than as an indemnity for damages." *Helfend v. Southern California Rapid Transit Dist.,* 2 Cal.3d 1, 84 Cal.Rptr. 173, 465 P.2d 61, 67 n. 17 (1970) (quoting *Anheuser–Busch, Inc. v. Starley,* 28 Cal.2d 347, 170 P.2d 448, 453 (1946) (Traynor, J., dissenting)). Under those circumstances, it is proper to permit plaintiffs to benefit from their own prudence, rather than tortfeasors. *See* Comments of Senator Meiklejohn, maj. op. at 1078 (it would be an "injustice" to apply retirement benefits and life insurance against the damages in a lawsuit). A holding to the contrary would leave a plaintiff who has the foresight to invest in life insurance, retirement benefits and disability benefits in a worse economic position than an individual without such foresight. The prudent individual will have borne the economic cost of purchasing this investment, but will earn no benefit for their foresight. *See Helfend,* 465 P.2d at 66.

Accordingly, I specially concur in the majority opinion.